875 F.2d 866
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
S & S SCREW MACHINE COMPANY, Respondent.
 No. 88-5636.
 United States Court of Appeals, Sixth Circuit.
 May 1, 1989.
 
 Before MERRITT and BOGGS, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 S & S Screw Machine Company (the "Company") appeals the decision of the National Labor Relations Board (NLRB) that it violated the National Labor Relations Act Secs. 8(a)(1) and (3) by giving employee Jimmie Kirby poorer work assignments and eventually terminating her because of her union activity.
 
 
 2
 * At the time relevant to the facts of this appeal, the Company manufactured turned metal and plastic parts in Cookeville, Tenn., employing 50-60 employees working in two shifts. Employee Jimmie Kirby was hired in late 1986. She contacted a representative of the United Steelworkers of America, AFL-CIO, CLC (the "union") in March 1987, and she and three other employees held a meeting with union representatives in Cookeville in April 1987. At the meeting these employees signed union authorization cards and employee Kirby took cards to distribute to other employees, which she did during off hours and at breaks at work.
 
 
 3
 On April 29, Reed Welch, the Company president, spoke to all employees. According to the testimony of several workers, Welch told the employees that he had heard rumors of a union and stated that he had shut down other plants before and would do so again if the Company unionized. After the speech Kirby asked to which union Welch was referring, and he replied "any damn union." When Kirby protested that the workers had a right to join a union and that he was violating the employees' rights, Welch stated he would never allow a union and told anyone who was dissatisfied to leave.
 
 
 4
 Kirby testified that after this exchange, her supervisor, Michael Frazier, accompanied her back to her work area and told her that she was now at the top of Welch's "shit list," and then gave her a written warning for excessive absenteeism based upon one late arrival on a day before the Welch speech. Kirby protested that she had received permission from plant manager Lafever to arrive late that day, but signed the warning under protest the next day.
 
 
 5
 The day after Welch's speech, Frazier transferred Kirby from the night shift to the day shift. Kirby testified that when she inquired as to the reason, Frazier told her it was partly for production reasons and partly a "set-up" in order to fire her because of "this Union business." While working on the first shift, Kirby was asked to operate machines that she had not operated before, and one of her jobs required dragging a pan of parts without wheels which weighed approximately 130 to 150 pounds. Kirby was also assigned to deburr parts, a "messy" job which caused debris to get in her face and hair. Management claimed however that everyone does this job at one time or another and that jobs are rotated among the employees every one to two weeks. There was testimony that at least one other woman had performed the "deburring".
 
 
 6
 Although management claims that Kirby's job performance was substandard at this time, in at least one instance the quality control department approved parts Kirby worked on, but these parts were later judged "bad" by her shift supervisor resulting in a warning for running parts that she failed to check.
 
 
 7
 David Judd and James Kennedy testified that about this time foreman Bryant asked them if they knew anything about the union or what they thought about unions. Foreman Wallace also asked Judd if certain employees were "for the union." About two weeks before the election, foreman Bryant told Judd that the Company had someone at the union meetings to report on the activities of the employees. Judd also testified that several times before the election, Bryant told him that any employee who voted for the union would lose his or her job, and plant manager Lafever told Judd that he "could use a no vote," and that there would be job rewards for a "no" vote.
 
 
 8
 The union election was held on June 29. The union lost, the final tally being seventeen to seventeen with one challenged vote. With the first paycheck received after the election, the employees received a notice that there would be a new absenteeism policy--three unexcused absences would result in termination. An unexcused absence was any absence not for a family death or with a doctor's excuse.
 
 
 9
 On June 8, Kirby injured her neck while pulling a pan of parts. She completed her shift but was unable to get out of bed the next day. Kirby phoned the plant and informed them of her injury and that she needed to see a doctor. Kirby saw Drs. Atnip, Verastige, and VanGloven at various times after her injury and did not return to work except to give the Company her doctors' excuses. After her last visit to Dr. VanGloven, the Company told Kirby that perhaps it would be best if she signed a voluntary leave of absence to protect her job, but Kirby was worried about the possibility of losing her worker's compensation benefits. The adjustor for the Company's workmen's compensation insurance carrier told Kirby that there would be no benefit payment at that time and that she would have to see a neurosurgeon before she returned to work in order to get benefits.
 
 
 10
 Kirby told the Company what the adjustor had said and went to see a neurosurgeon, Dr. McPherson, on Friday, July 10, who told her that she had ripped all of the muscles and ligaments in her neck. He suggested that she could return to work and that "one day the pain will stop." On Monday, July 13, Kirby called the Company, told the Company secretary of McPherson's diagnosis, but told her that she was still in pain and planned to see her "private doctor," Dr. Green. Kirby could not see Dr. Green that week because he was on vacation. On Saturday, July 18, Kirby learned that she had been fired. When she called the office, she was told that she was fired because she failed to return to work after release by the neurosurgeon. On Monday, July 20, Kirby received a notice by registered mail informing her of her termination for "failure to report to work after being released from Doctor."
 
 
 11
 Kirby saw Dr. Green the following week. He advised her that some muscles had been pulled but would eventually heal. He gave her some pain medication, and advised her to see a neurologist.
 
 
 12
 The union brought unfair labor charges against the Company, and the matter was brought before the ALJ in September 1987. The ALJ issued his decision on November 30, 1987, finding that the Company violated NLRA, Secs. 8(a)(1) and (3), by unlawfully interfering with the union vote, and by giving employee Kirby less desirable jobs and eventually terminating her for union activity. The NLRB affirmed the ALJ's findings and conclusions on March 28, 1988, and applied for enforcement before this court on June 15, 1988. The Company challenges only the findings of violations as they relate to employee Kirby.
 
 II
 
 13
 Whether an employer discharged an employee because of anti-union activity is a question of fact, and is therefore to be reviewed under the substantial evidence rule. N.L.R.B. v. E.I. DuPont De Nemours, 750 F.2d 524, 527 (6th Cir.1984). If an employer discharges or otherwise unfavorably treats an employee because of that employee's union activities, and has no other basis for the action or the reason offered is pretextual, then that employer violates Secs. 8(a)(3) and (1) of the National Labor Relations Act. Id. at 528-29.
 
 
 14
 The board may rely on circumstantial evidence for this determination, and may find the necessary motive in a company's expressed hostility towards unionization combined with knowledge of the employee's union activities. Ibid. Since the Company did not appeal the NLRB's findings regarding its anti-union activity in the present case, it has abandoned its right to object to those determinations. N.L.R.B. v. Valley Plaza, Inc., 715 F.22d 237 (6th Cir.1983). In cases of mixed motive, an employer's termination violates the Act if it would not have occurred but for the protected activity. N.L.R.B. v. A & T Mfg. Co., 738 F.2d 148, 149 (6th Cir.1984).
 
 
 15
 In the present case, the Company insists that the only reason for Kirby's discharge was her failure to report to work after being "released" by the neurosurgeon. The Company also contends that her shift and job transfer were normal occurrences and had nothing to do with her union activity. However, there is more than substantial evidence to support the Board's findings to the contrary.
 
 
 16
 Kirby was told that she was being transferred to the day shift because of her union activity. The timing of her shift change is also significant. Kirby was transferred the morning after her union sympathies became known. Kirby was also reprimanded at this time for being tardy even though undisputed evidence revealed that she had permission for this tardiness.
 
 
 17
 The Company's contention that Kirby was fired because of unexcused absences is likewise unavailing. Kirby reported to the Company after each visit to a physician. After her visit to Dr. McPherson, Kirby informed the Company that she was going to see her own doctor, and she was fired without any notification from the Company that this was unacceptable to it. It is also clear that Kirby had a legitimate medical problem. This coupled with the obvious evidence of anti-union animus and knowledge of Kirby's union activity supplies the substantial evidence necessary for the board's finding.
 
 
 18
 Therefore, the order of the NLRB is ENFORCED.