968 F.2d 1215
 140 L.R.R.M. (BNA) 2744
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
LANCASTER FAIRFIELD COMMUNITY HOSPITAL, Petitioner, Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner,
 Nos. 91-6014, 91-6101.
 United States Court of Appeals, Sixth Circuit.
 June 26, 1992.
 
 Before GUY and BOGGS, Circuit Judges, and RONEY, Senior Circuit Judge.*
 PER CURIAM.
 
 
 1
 This action began with an unfair labor practice charge filed by Richard Paxton pursuant to Section 10(b) of the National Labor Relations Act ("Act"), 29 U.S.C. § 160(b). An ALJ held a one-day hearing on April 19, 1990. The ALJ later issued his recommended decision and order, finding that Lancaster Fairfield Community Hospital had violated that Act. The Hospital filed exceptions with the NLRB. The Board then issued its final decision upholding the decision of the ALJ. The Hospital appeals the Board's order to this court. The Board has filed a cross-application for enforcement of its order. For the reasons that follow, we grant the Board's application and enforce its order.
 
 
 2
 * This case involves the Hospital's decision in September 1989 to refuse Richard Paxton's request for a lateral transfer from his position as outdoor groundskeeper to an equivalent position inside the building at the same pay. The Hospital hired Paxton in August of 1983. As outside groundskeeper, Paxton also often performed maintenance work inside the hospital, especially during the winter. Paxton's work was consistently rated above average.
 
 
 3
 In the late summer of 1988, the Bus, Sales, Truck Drivers, Warehousemen, and Helpers Local Union 637, affiliated with the Teamsters, initiated a union organizing campaign at the hospital. Paxton served as the president of the local union organizing committee and distributed information and arranged meetings. Paxton regularly wore his union jacket to work.
 
 
 4
 About August 21, 1989, the Hospital posted a notice of job vacancy for a "Tech II General" position that had been vacated. The job entailed performing general maintenance inside the hospital, and required an employee with light mechanical, electrical, and carpentry skills, as well as skill in maintaining the grounds. Paxton had performed many of these jobs in his groundskeeper position and wanted to transfer to inside work. Paxton submitted his application to his supervisor, Leon Miller, and told him that he had been performing the duties of the vacant position for the past six years as groundskeeper. Paxton's relationship with Miller was apparently quite rocky and Paxton believes that his supervisor was biased against him because of his union activity.
 
 
 5
 Another employee, Paul Shonk, also submitted an application on the same day as Paxton. Shonk had worked at the Hospital for about 10 months in a part-time Tech II position. Shonk stated on his application that he had extensive experience in maintenance. The Supervisor interviewed Shonk for the position on August 25. On August 28, a notice was posted on the shop chalk board announcing that the job had been awarded to Shonk. The note was erased by the end of the day and the hospital claims it was a simple mistake.
 
 
 6
 Shortly after this apparent initial award of the job to Shonk, Supervisor Miller spoke to Shonk while Shonk was on duty. Miller asked Shonk to get any records he had about his prior technical training and general schooling, and told Shonk that he could stay on the clock and go home to get the records. Miller stated that he wanted the records because he did not want any grievance that Paxton might file validated and that he did not want Paxton working inside.
 
 
 7
 On September 7, Miller interviewed Paxton. Miller asked Paxton personal questions about where he had grown up and briefly discussed Paxton's experience as a truck driver. Miller did not ask about Paxton's work experience at the hospital, nor did he ask Paxton to discuss or document training courses he had taken. On Paxton's transfer request form, Miller wrote that Paxton had not been selected because the "candidate selected for the position has significantly more experience and education ... which makes him better suited for the vacancy."
 
 
 8
 On September 8, Paxton filed a grievance, known as a "Fair Treatment Complaint", claiming that Supervisor Miller was biased against him and that it was unfair for the hospital to transfer Shonk instead of him. On October 19, the Hospital's Fair Treatment Committee ruled against Paxton. In a letter dated November 2, Hospital President Joseph McKelvey notified Paxton that his "application for transfer was not handled properly," but that he had decided to affirm the decision of the Committee.
 
 
 9
 In November, Shonk applied for and received a promotion. On November 20, Paxton applied for the Tech II "inside shop" position that Shonk vacated. The Hospital awarded Paxton the position. However, when Paxton began working inside, the hospital assigned him to work in the boiler room rather that to the general maintenance position that he had been awarded. Paxton had never worked in the boiler room and the position allowed little contact with other employees. Paxton complained about the assignment to newly appointed Plant Engineering Department Manager Charles Ebel. Ebel told Paxton that "[t]he reason why you're over in the boiler room is to keep you out of sight and out of the mind of the administration because they're so god damned mad at you.... Ebel also told him that "when things cool down and I feel it's the appropriate time ... I'll try and approach them and see about these jobs that you're talking about."
 
 
 10
 The ALJ in this case found that the Hospital had violated § 8(a)(3) and (1) of the Act by denying Paxton's September 1989 transfer and by failing to transfer him to the position he had been awarded in November 1989, because of his union activity. The Board affirmed the ALJ, and ordered the Hospital to cease and desist from the unfair labor practices found and from future interference with its employees' exercise of their statutory rights. The Board's order also required the Hospital to offer Paxton an immediate transfer to the inside Tech II General position which he requested in September 1989, or to a substantially equivalent position if that job no longer exists, without prejudice to any of his rights.
 
 II
 
 11
 We must determine whether substantial evidence on the record as a whole supports the Board's finding that the hospital violated § 8(a)(3) and (1) of the Act by denying Paxton a requested transfer and by subsequently failing to implement an approved transfer of Paxton, because of his union activity. This court will uphold the Board's findings of fact if they are supported by substantial evidence. Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951). The Board's application of law to the facts is also reviewed under the substantial evidence standard. Turnbull Cone Baking Co. v. NLRB, 778 F.2d 292, 295 (6th Cir.1985). Reasonable inferences drawn by the Board may not be disturbed on appeal, even if the appellate court would have reached a different result if the matter had been before it de novo. NLRB v. United Insurance Co., 390 U.S. 254, 260 (1968). Evidence is considered substantial if it is adequate for a reasonable mind to reach the same decision as the Board. Universal Camera, 340 U.S. at 477, 488.
 
 
 12
 Section 8(a)(3) of the Act makes it an unfair labor practice for an employer to discriminate against employees with regard to hire or tenure of employment in order to discourage membership in a labor organization. It is well-settled that an employer violates § 8(a)(3) and (1) by denying a transfer to or taking other adverse actions against an employee because of antiunion animus. NLRB v. Ford Motor Co., 683 F.2d 156, 158 (6th Cir.1982). A violation of § 8(a)(3) turns on whether the employer's action was motivated by antiunion animus. NLRB v. Transportation Management Co., 462 U.S. 393 (1983). The critical issue, then, concerns the employer's motivation for taking the adverse action.
 
 
 13
 Where an employer's opposition to union activity is shown to be the motivating factor in a decision to take adverse action, a violation is established unless the employer can prove that the action would have taken place even in the absence of the employee's protected activity. NLRB v. Transportation Management Corp., 462 U.S. at 400, 402-03, approving Wright Line, 251 N.L.R.B. 1083, 1089 (1980), enf'd on other grounds, 662 F.2d 899 (1st Cir.1981), cert. denied, 455 U.S. 989 (1982). Accord NLRB v. A & T Mfg. Co., 738 F.2d 148, 149 (6th Cir.1984). The General Counsel is required to make a prima facie showing sufficient to support the inference that the protected conduct was the motivating factor in the employer's decision. Wright Line, 251 N.L.R.B. at 1089. Once the General Counsel makes this showing, the burden shifts to the employer to show that it would have taken the same action even in absence of the protected activity. Transportation Management, 462 U.S. at 401-02. In other words, the employer must show that it would have taken the same action "in any event and for valid reasons." Id. at 400. In determining motivation, the Board may rely on circumstantial as well as direct evidence. NLRB v. E.I. Du Pont de Nemours, 750 F.2d 524, 529 (6th Cir.1984). The Board's determination of the motivation issue is also entitled to acceptance by this court if it is supported by substantial evidence, even if this court would have come to a different de novo decision. Roadway Express, Inc. v. NLRB, 831 F.2d 1284, 1289 (6th Cir.1987).
 
 III
 
 14
 The hospital claims that both the Board and the ALJ erred in determining that antiunion animus motivated the hospital's action and in determining that the hospital did not prove that it would have taken the same action in the absence of the protected activity. The hospital argues that antiunion animus cannot be inferred merely from an employee's union status. Further, the hospital contends that the fact that this action occurred immediately after Paxton took a leadership role in the union organizing campaign is not sufficient to establish illegal motivation. The hospital also claims that the ALJ was clearly biased because he systematically credited all of the employee's witnesses and discredited the hospital's.
 
 
 15
 The hospital further maintains that the ALJ's findings were tainted by inadmissible evidence or unsupported by the record. First, the hospital argues that alleged comments made by Supervisor Miller could not be used as evidence in an unfair labor practice proceeding because they were protected by § 8(c) of the Act. The hospital relied on a line of cases in which the courts have held that an employer's statements opposing union organization, but lacking threats or promises, cannot serve as evidence for a finding of unlawful antiunion animus. See, e.g., Holo-Krome Co. v. NLRB, 907 F.2d 1343, 1345 (2d Cir.1990). However, the Board found it unnecessary to pass on the hospital contentions, finding an independent basis for its determination that Paxton's union activities motivated the actions of his employer.
 
 
 16
 The hospital contends that the General Counsel did not prove that the actions in this case were motivated by antiunion animus and, therefore, the hospital was not required to prove that it had legitimate reasons for its actions. The hospital further argues that the Board erred in finding that the hospital's asserted reasons for its actions were pretextual. The hospital maintains that it promoted Shonk instead of Paxton the first time because Shonk was better qualified. In addition, it eventually did move Paxton to an inside job.
 
 
 17
 The Board argues, and we agree, that its order is supported by substantial evidence. It was undisputed that Paxton was a union leader and that the hospital management, including Supervisor Miller, knew this. Further, the evidence shows that the hospital management handled Paxton's application in a perfunctory manner, and did not give him serious consideration. Both Shonk and Paxton submitted their applications on August 25. Shonk was interviewed the same day, but Paxton was not interviewed until September 7. In addition, by the time of Paxton's interview the hospital had seemingly already awarded the position to Shonk, evidenced by the fact that an announcement of the job award was initially posted on August 28, over a week before Paxton was ever interviewed. Even the Hospital president commented that Paxton's application for transfer had not been handled properly.
 
 
 18
 The Board also found that the hospital did not really compare the qualifications of Shonk and Paxton before making its decision. The record establishes that the hospital only sought information about Shonk's qualifications after it had selected him for the job and only after it learned that Paxton intended to file a grievance. Shonk testified that shortly after August 28, Supervisor Miller instructed him to bring in documentation of his education and training. The hospital was apparently so anxious to get this information that Shonk was allowed to leave work to get it. Further, Miller admitted to Shonk that he wanted the records to defeat Paxton's grievance because he did not want to work inside with him.
 
 
 19
 By contrast, the hospital did not ask Paxton to supplement his transfer request with records of additional training. Even during the seemingly pretextual interview, Miller made no effort to question Paxton about his qualifications. The Board contends that the record amply demonstrates that the hospital did not rely on Shonk's assertedly better qualifications when it selected him. Rather, the hospital became concerned about Shonk's qualifications only as an afterthought to justify its selection of Shonk--a part-time employee with only ten months experience at the hospital--over Paxton, a leading union supporter who had worked at the hospital for five years in a full-time position, who had performed all of the duties involved in the indoor position, and who had consistently received above average ratings. The Board further noted that the hospital's claim that Shonk's experience and education made him better suited for the vacancy "was so overblown and unjustified as to be further evidence of the pretextual nature of the Hospital's asserted justification." Shonk's background consisted of 22 semester hours of junior college in 1962 and some technical courses prior to leaving the military in 1969, all of which were irrelevant to the Tech II position. Further, the Board asserts that an examination of the document awarding Shonk the transfer shows that the award initially was dated September 1, but in two places the "1" was written over to be a "7", the date of Paxton's interview.
 
 
 20
 Since the Board found that the reason given by the hospital was pretextual, the Board reasonably inferred that the hospital proffered the false reason to conceal its unlawful intent. When an employer proffers a false explanation, the Board is permitted to infer that the real motive "is one that the employer desires to conceal--an unlawful motive--at least where ... the surrounding facts tend to reinforce the inference." Shattuck Denn Mining Corp. v. NLRB, 362 F.2d 466, 470 (9th Cir.1966).
 
 
 21
 We are also persuaded that substantial evidence supports the Board's finding that the hospital's transfer of Paxton to a position in the boiler room was unlawfully motivated. Paxton applied for the Tech II position a second time and ostensibly was selected for that position by the hospital. The hospital, however, then assigned Paxton to the boiler room, where he had little contact with other employees. As stated above, Plant Engineering Department Manager Ebel admitted when confronted by Paxton that he was put in the boiler room because the administration was angry with him. The Board found that the transfer was "motivated by a desire to camouflage [the hospital's] earlier discrimination against [Paxton] by making it appear that it was granting approval to his requested transfer [while at] the same time ... attempt[ing] to isolate him from contact with other employees until the union activities at the facility dissipated ..."
 
 
 22
 The Board maintains that none of the hospital's objections to its rulings have merit. The Board reasonably found that the hospital's sole asserted reason for denying Paxton the transfers was pretextual. Since its only asserted legitimate reason was a pretext, no further inquiry into the hospital's Wright Line defense was necessary. As the Board explained in Wright Line, 251 N.L.R.B. at 1084, once it is established that the employer's asserted justification was not in fact relied upon, the Board can find that the employer has not even demonstrated that legitimate concerns played any part in its decision. Accordingly, the Board is no longer faced with the problem of determining the extent to which the employer's action was a product of both lawful and unlawful considerations. In these circumstances, the Board acts reasonably in not specifically considering whether the employer has established the affirmative defense recognized under the Wright Line/Transportation Management dual motive cases. Republic Tool, 680 F.2d 463, 465 (6th Cir.1982); Limestone Apparel Corp., 255 N.L.R.B. 722 (1981), enf'd, 705 F.2d 799 (6th Cir.1982).
 
 
 23
 In addition, the Board specifically stated that it was not relying on the statements of Supervisor Miller about the union as evidence of antiunion animus. The Board clearly identified the evidence--including Paxton's leading union role, the hospital's knowledge of that role, and the hospital's assertion of a pretextual reason for its decision--from which it inferred unlawful motivation.
 
 IV
 
 24
 In sum, we find that there is at least enough evidence to lead a rational person to come to the same conclusion as the ALJ and the Board. So, under the deferential standard of review applicable in this case, we grant the Board's cross-application for enforcement of its order.
 
 
 
 *
 Honorable Paul H. Roney, United States Court of Appeals for the Eleventh Circuit, sitting by designation