**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**A & T MANUFACTURING COMPANY, Respondent.**

No. 83–5307.

United States Court of Appeals, Sixth Circuit.

Argued April 5, 1984.

Decided June 29, 1984.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., William R. Stewart, Alli-

son W. Brown, argued, Morton Namrow, Washington, D.C., for petitioner.

Blake Page, argued, Page, Clay & Thomas, Winchester, Ky., for respondent.

Before KENNEDY and CONTIE, Circuit Judges, and PECK, Senior Circuit Judge.

CONTIE, Circuit Judge.

The National Labor Relations Board (Board) applies for enforcement of an order holding that A & T Manufacturing Company (A & T) violated § 8(a)(1) and (3) of the National Labor Relations Act. Since A & T did not contest the Administrative Law Judge's (ALJ) findings of § 8(a)(1) violations before the Board, the Board's findings concerning those charges are enforced.[1] See 29 U.S.C. § 160(e); *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665, 102 S.Ct. 2071, 2083, 72 L.Ed.2d 398 (1982). With respect to the findings of § 8(a)(3) violations, we enforce in part, vacate in part and remand for further proceedings.

This case involves A & T's alleged discriminatory lay-off of twenty-five "shop" employees and discriminatory discharge of one "field" employee. The record indicates that A & T is a Kentucky corporation engaged in the fabrication and installation of coal processing and loading equipment. Shop employees fabricate the equipment and field employees install the equipment at customers' work sites. During the relevant time period, A & T's most important customer was a foreign firm named USA-CO.

A & T shop employees began discussing unionization in August 1980. On August 20, the first organizational meeting took place at a local motel. Two days later, A & T laid off twenty-five of its twenty-eight shop employees. Field employee Jimmy Popp was discharged on September 23. A representation election occurred on October 17, 1980. The ALJ reasoned that since A & T had multiple motives for the lay-offs and the discharge, the case should be evaluated under the standard established in *Wright Line*, 251 N.L.R.B. 1083 (1980). The ALJ concluded that the lay-offs violated § 8(a)(3) but that A & T had legally terminated Popp. Although the Board adopted the ALJ's findings concerning the lay-offs, it held that the discharge also violated § 8(a)(3).

The Supreme Court recently approved the *Wright Line* test for use in cases involving mixed employer motives. *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). Under this test, the General Counsel initially must demonstrate that anti-union animus contributed to the decision to lay-off or terminate employees. If this burden is satisfied, the employer must then show by a preponderance of the evidence that the employees would have been laid-off or terminated even had they not been engaged in protected activity. *See Wright Line*, 251 N.L.R.B. at 1089. It is well established that an employer's motive for laying off or terminating employees is a factual question. *See NLRB v. Buckhorn Hazard Coal Corp.*, 472 F.2d 53, 56 (6th Cir.1973); *NLRB v. Howell Automatic Machine Company*, 454 F.2d 1077, 1080 (6th Cir.1972); *NLRB v. Murray-Ohio Manufacturing Co.*, 358 F.2d 948, 950 (6th Cir.1966). The Board's factual determinations must be upheld if supported by substantial evidence on the record considered as a whole. 29 U.S.C. § 160(e). Moreover, since this court does not undertake *de novo* review, the Board's order must be enforced if the evidence supports two fairly conflicting views. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *NLRB v. Naum Brother's Inc.*,

---

1. The § 8(a)(1) violations involved interrogating employees about their union activities and sympathies, threatening employees with plant closure or discharge because of the union activities, informing employees that co-workers had been laid off on account of union activities, threatening to conduct surveillance, and actually conducting surveillance, of union meetings, warning employees not to sign union authorization cards and enforcing overly broad no solicitation and no distribution rules.

637 F.2d 589, 591 (6th Cir.1981). With these standards of review in mind, we first address the lay-offs and then examine the discharge of Popp.

■ The Board correctly held that the General Counsel had established that anti-union animus contributed to the decision to lay-off the twenty-five shop employees. A & T evinced its anti-union animus, for instance, by committing numerous § 8(a)(1) violations. These violations included threats to discharge employees who engaged in protected activities and to close the plant if the union prevailed. Moreover, one A & T supervisor advised an employee that "the reason the shop was laid-off was the union." Thus, the burden properly was shifted to A & T to prove that the employees would have been laid-off even in the absence of protected activity.

■ The company contends that the lay-offs were necessitated by adverse general economic conditions and by the loss of USACO as a customer. Regarding the former justification, we find substantial evidence to support the Board's conclusion that A & T did not lay-off the shop employees for that reason. The record shows that A & T actually increased its shop work force from twenty to twenty-eight employees during 1980 and that even after the lay-off, some employees were recalled and worked substantial overtime. Moreover, Exhibit 2, a graph of A & T's work in process as of the end of each month of 1980, does not demonstrate that the company was adversely affected by general economic conditions. The graph, heavily relied upon by the company, shows that during the four months preceding August 1980, A & T's work in process remained above $4.5 million. To the extent that Exhibit 2 is a reliable measure of the general economic conditions facing A & T, it shows that the company's economic condition was relatively stable within three weeks of the lay-offs. The sharp decline in work in process reported as of August 31, 1980 may be attributable to the termination of the business relationship with USACO that occurred late in August rather than to general economic conditions.[2] In the alternative, we hold that even if Exhibit 2 does constitute some evidence of a general economic downturn, the evidence on that issue is conflicting. We may not, of course, disturb the Board's findings where the evidence supports two fairly conflicting views.

■ The Board did hold, however, that A & T's desire to terminate its business relationship with USACO, a slow paying customer, partially motivated the lay-offs. Nevertheless, the employee's organizational campaign was found to be the factor that ultimately persuaded A & T to end its relationship with USACO in late August 1980. The record indicates that from May 2, 1980 to July 21, 1980, USACO accumulated an overdue balance of over $411,000. On the latter date, USACO paid $350,000, leaving a balance of over $61,000. Subsequent billings increased this balance to approximately $210,000 by August 22. The record establishes, therefore, that when A & T decided to cease doing business with USACO, A & T had in the past tolerated much larger overdue balances for longer periods of time. There was no indication in August 1980 that USACO was financially troubled or was otherwise unwilling eventually to pay its debts. Furthermore, A & T never made a final demand on USACO (as might be expected in dealing with one's most important customer) that USACO pay the balance owed or face the consequences of not doing so. Under these circumstances, substantial evidence supports the Board's conclusion that A & T was perfectly willing to tolerate USACO's payment practices until the union organizational effort began. Consequently, substantial evidence also supports the finding that the shop employees would not have been laid-off on August 22 had they not been engaged in protected activities. A & T violat-

---

**2.** Exhibit 2 merely graphs changes in A & T's work in process without explaining why those changes occurred.

ed § 8(a)(3) by laying-off the twenty-five shop employees.

■ We next consider whether substantial evidence supports the Board's finding that Jimmy Popp would not have been discharged had he not engaged in organizational efforts. The record shows that Popp actively supported the union and that he was harrassed by company officials for doing so. On August 25, for example, an A & T supervisor asked Popp if he had signed a union authorization card and warned that if the union prevailed, company president Browder would temporarily close the shop and reopen it under another name. On September 3, Browder personally threatened Popp with discharge if the latter promoted the union at any time on company property. We have already held that each of these incidents constituted a § 8(a)(1) violation. The General Counsel clearly demonstrated that anti-union animus contributed to the decision to terminate Popp.

In an effort to rebut this prima facie case, A & T identified two other reasons that it claims motivated its decision. The record reflects that Popp cursed his supervisor on August 27. Although the supervisor dropped the matter without either taking disciplinary action or informing Browder, Browder apparently heard about the incident in mid-September and decided to discharge Popp. Browder could not do so immediately, however, because Popp missed five straight days of work. On three of these five days, Popp violated a company rule by not telephoning his supervisor in order to provide notice of his impending absence. The company rule provided that employees who failed to notify their supervisors of daily absences would be terminated. When the discharge occurred on September 23, Browder told Popp that the reasons for the action were the latter's insubordination and his unreported absences. The company's position, therefore, is that Popp would have been terminated even in the absence of union activities.

The Board found, as had the ALJ, that A & T's reliance upon the August 27 incident was pretextual in view of the immediate supervisor's reaction to the incident, the length of time that passed between the incident and the decision to discharge, and Browder's "extremely vague" testimony about the matter. The Board then proceeded, however, to reject the ALJ's conclusion that Popp's repeated noncompliance with the company rule would have resulted in discharge in any event:

> We disagree with the Administrative Law Judge's conclusion that [A & T] relied on Popp's absenteeism as a reason for his discharge. Browder's testimony, credited by the Administrative Law Judge, makes it clear that Browder decided to discharge Popp *before* Popp's absences. Thus, we find that [A & T] based its decision to discharge Popp solely on Popp's alleged insubordination. As we agree with the Administrative Law Judge that reliance on this incident as a reason for the discharge is pretextual, we find that Popp's discharge violated the Act, and will direct that he be reinstated with back pay. [Emphasis original.]

Although we agree with the Board that the company's reliance upon the August 27 incident was pretextual, we hold that substantial evidence does not support the Board's factual determination that the sole reason underlying the discharge was Popp's insubordination. The central inquiry in dual motivation cases is the employer's motive when the discharge takes place. Although Browder decided to discharge Popp for illegal reasons in mid-September, the fact remains that a legitimate reason presented itself between the original determination and its effectuation. This reason may also have motivated Browder's eventual action. The Board in this case has focused not upon Browder's motives when the discharge actually occurred, but rather upon his motives at an earlier time. Moreover, the Board in effect has established a *per se* rule that once an employer decides to discharge an employee for an illegal reason, it is impossible for that employer to adopt an additional legiti-

mate reason between the time of the determination and the time of its effectuation. This *per se* factual rule comports neither with reality nor with the Board's own precedent. In *Klate Holt Co.*, 161 N.L.R.B. 1606, 1612 (1966), the Board stated:

> The mere fact that an employer may desire to terminate an employee because he engages in unwelcome concerted activities does not, of itself, establish the unlawfulness of a subsequent discharge. If an employee provides an employer with a sufficient cause for his dismissal by engaging in conduct for which he would have been terminated in any event, and the employer discharges him for that reason, the circumstance that the employer welcomed the opportunity to discharge does not make it discriminatory and therefore unlawful.

Accordingly, we hold that substantial evidence does not support the Board's finding that Popp's repeated violations of the company rule played no part in the decision to discharge him. We vacate that portion of the Board's order and remand the case so that the Board may determine: (1) whether Popp's repeated failures to comply with the company rule in fact partially motivated the company's decision at the time of the discharge and (2) if so, whether Popp would have been discharged for violating the rule even in the absence of protected activity. We express no view on the merits of these questions.

The order of the National Labor Relations Board is ENFORCED IN PART, VACATED IN PART, and REMANDED for further proceedings consistent with this opinion. Each party shall bear its own costs on this appeal.