**MANIMARK CORPORATION,**
Petitioner/Cross–
Respondent,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent/Cross–
Petitioner.

Nos. 92–5965, 92–6086.

United States Court of Appeals,
Sixth Circuit.

Argued June 22, 1993.

Decided Oct. 21, 1993.

Russell S. Linden (briefed), Bradley T. Raymond (argued and briefed), Finkel, Whitefield & Selik, Farmington Hills, MI, for petitioner-cross-respondent.

John C. Truesdale, Executive Secretary, N.L.R.B. Office of the Gen. Counsel, Aileen A. Armstrong, Deputy Asso. Gen. Counsel, Linda Dreeben (briefed), Deborah E. Shrager (argued and briefed), N.L.R.B., Appellate Court Branch, Washington, DC, William C. Schaub, Jr., Acting Director, N.L.R.B., Region Seven, Detroit, MI, for respondent-cross-petitioner.

Before: KENNEDY and NORRIS, Circuit Judges; and KRUPANSKY, Senior Circuit Judge.

ALAN E. NORRIS, Circuit Judge.

Manimark Corporation petitions for review of the National Labor Relations Board's (the "Board") decision that Manimark violated section 8(a)(1) of the Labor Management Relations Act, 29 U.S.C. § 158(a)(1), when it discharged employee Hurley Fields for engaging in protected, concerted activity. The Board cross-petitions for enforcement of its order. For the reasons that follow, we decline to enforce the decision of the Board.

## I.

Manimark services food vending machines in Belleville, Michigan. From September 1988 until January 1991, Fields worked at Manimark as a route driver restocking vending machines at the Detroit Metropolitan Airport. Drivers at Manimark were not represented by a labor union.

During his tenure at Manimark, Fields and other drivers frequently discussed problems they had with the maintenance of their trucks. According to Fields, another topic of conversation was the poor communication between drivers and their supervisors. Fields also suggested that he and other drivers were upset over the habitual tardiness of the supplier of Hostess products, since this delayed stocking their trucks prior to leaving work for the day.

Fields was blunt and outspoken and occasionally disparaged his fellow workers, as

when he referred to the company's janitor as a drunk, and made off-color remarks about two drivers who were frequently seen together. There was evidence that his abrasiveness had alienated other workers. For instance, Fields originally shared his route with another driver, but his partner soon requested and received a transfer to another route due to a personality conflict.

On January 4, 1991, Gary Morris, the company's vice president and general manager, called Fields into his office and informed him that there was a change in the way his commission would be calculated. Fields was upset by the change and called it unfair. He also informed Morris that he and other drivers had complaints about inadequate maintenance of the trucks they drove, poor communication with supervisors, and the late arrival of the Hostess supplier. Morris suggested that Fields arrange for a group of employees to meet with Morris to discuss their problems. Fields never mentioned this January 4 discussion to any of his coworkers.

On January 11, when Morris asked Fields if he had arranged the meeting with the other drivers, he replied that he had not had the time to do so. That same day in the warehouse, while Fields was asking two other employees about payment for unused sick days, Robin Merkel, an assistant to the company controller, entered. One of the three employees suggested that Merkel could explain how sick pay was paid. She answered that pay for unused sick days was computed in January and paid out in February. Fields disagreed with this policy and said that the drivers should be able to carry over unused sick time from year to year. Merkel said she did not formulate the policy and that if Fields had a problem with it, he should talk with Morris. Fields answered that he just might do that.

On January 14, Morris informed Fields that his employment was terminated and handed him a letter explaining that he was discharged "because of [his] disruptive behavior and negative attitude towards criticism of that behavior." The letter listed some of Fields' conduct that had influenced Morris' decision. It noted that on January 4 Fields had relayed some complaints he and "another driver" had. Although Morris offered to schedule a meeting to discuss those concerns, Fields said he "didn't have the time." Morris wrote that he therefore "assumed [Fields] had no interest in working out problems."

The letter pointed out that on January 11, Fields had "challenged" Merkel about payment for unused sick days without asking anyone with the authority to set policy. Finally, the letter referred to the "vicious slurs" Fields had used to describe coworkers, noted he had responded with rage to criticism of the cleanliness of the machines he serviced, and had refused to comply with the company policy of using the oldest products first. Morris observed that he was "spending too much time dealing with the aftermath of your presence. Your disruptive behavior is a detriment to the company, thus the necessity to end your employment with Manimark Corporation."

In February 1991, the Board issued a complaint alleging, among other things, that Fields was discharged for engaging in protected, concerted activities, in violation of 29 U.S.C. § 158(a)(1).

After a hearing, an Administrative Law Judge ("A.L.J.") held that it had been established that Fields' discharge was motivated by protected, concerted activity because he was terminated for conveying group complaints to management. The A.L.J. ordered Fields reinstated with back pay, and the Board affirmed. Manimark petitions for review of this order.

## II.

■ The factual findings of the Board are conclusive if supported by substantial evidence on the record as a whole. 29 U.S.C. § 160(e). The Labor Management Relations Act accords employees the right to form and join unions and to "engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. It is deemed an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of" these rights. 29 U.S.C. § 158(a)(1). To establish a violation of

§§ 157 and 158(a)(1), the Board must show "that the employee was engaged in such protected concerted activity, that the employer knew of the activity and its concerted nature, and that the employee's protected activity was a motivating factor prompting some adverse action by the employer." *Ajax Paving Indus., Inc. v. NLRB,* 713 F.2d 1214, 1216 (6th Cir.1983). The employer may then affirmatively defend by proving by a preponderance of the evidence that the employee would have been discharged in any event for unprotected conduct. *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 400, 403, 103 S.Ct. 2469, 2473, 2475, 76 L.Ed.2d 667 (1983).

■ Manimark does not dispute that Fields' complaints were protected activity, as they related to "wages, hours, [or] other working conditions." *NLRB v. Lloyd A. Fry Roofing Co.,* 651 F.2d 442, 445 (6th Cir.1981). It argues, however, that the complaints were merely personal gripes and in no way concerted. We agree that there was insufficient evidence to support the Board's finding that Fields' complaints to Morris on January 4 were concerted.

This court has held that for an individual's complaints to constitute concerted action, they "must not have been made solely on behalf of an individual employee, but [they] must be made on behalf of other employees or at least be made with the object of inducing or preparing for group action." *ARO, Inc. v. NLRB,* 596 F.2d 713, 718 (6th Cir. 1979).

The A.L.J. concluded that Fields' expressions of dissatisfaction on January 4 were concerted because they were matters of concern both to Fields and to his fellow drivers. Moreover, the company recognized that these were group complaints, the A.L.J. reasoned, since Morris suggested a group meeting to deal with them. The Board agreed with the A.L.J.'s finding of concerted action, observing that Fields was "airing complaints about working conditions previously discussed with and shared by other drivers."

■ Completely absent from this stated rationale, however, is mention of any connection between the shared concerns of Manimark's drivers and Fields' reiteration of them on January 4, other than the fact that Fields' complaints were voiced at a time subsequent to the discussions of drivers. Traditionally, this court has required more than a mere temporal connection between the airing of group concerns and an individual employee's complaints to management. Instead, the Board must prove that the employee in question was "acting on behalf of, or as a representative of, other employees rather than acting for the benefit of other employees only in a theoretical sense." *ARO,* 596 F.2d at 717.

■ Although workers need not formally choose the complaining employee as their spokesperson, *see Dayton Typographic Serv., Inc. v. NLRB,* 778 F.2d 1188, 1192 (6th Cir. 1985), that employee "must be actually, rather than impliedly, representing the views of other employees." *Jim Causley Pontiac v. NLRB,* 620 F.2d 122, 126 n. 7 (6th Cir.1980).

The evidence in this case is too thin to support a conclusion that on January 4 Fields was acting on behalf of anyone other than himself. Significantly, his conversation with Morris that day began when Morris summoned Fields to his office to talk about a compensation matter that affected only Fields. When Fields objected to the change in his commission, he was expressing a purely personal complaint. Although it is not clear how the topic of Fields' other concerns arose, it is apparent that he did not go to Morris that day with the purpose of listing the drivers' work-related grievances. Instead, after deeming the commission change unfair, Fields added as an afterthought that he and others had complained about the maintenance of their trucks, poor communication, and the tardiness of the Hostess driver.

The Board's conclusion that Fields was acting concertedly in listing these concerns for Morris is further undermined by the fact that Fields never told any of the other employees that he was going to, or had, made complaints to management on their behalf. Accordingly, this case is unlike the situation in *Ajax Paving,* where the individual employee expressed a group concern to management. When he told his coworkers what he

had done, one of them indicated that if he had known, he would have accompanied the complaining employee in approaching management. *Ajax Paving*, 713 F.2d at 1216. Finally, Fields' refusal to follow up on the problems by arranging a group meeting weakens his argument that he was acting on behalf of other drivers.

In his opinion, the A.L.J. relied heavily upon the fact that Fields was "bringing truly group complaints to the attention of management," since Board precedent had included such conduct in the definition of concerted activity. In its *Meyers* decisions, the Board clarified the test it applies to claims of concerted activity. *Meyers Indus., Inc.*, 268 N.L.R.B. 493 (1984) (*Meyers I*), *rev'd sub nom. Prill v. NLRB*, 755 F.2d 941 (D.C.Cir.), *cert. denied*, 474 U.S. 948, 106 S.Ct. 313, 88 L.Ed.2d 294 (1985), *on remand, Meyers Indus., Inc.*, 281 N.L.R.B. 882 (1986) (*Meyers II*), *aff'd, Prill v. NLRB*, 835 F.2d 1481 (D.C.Cir.1987), *cert. denied*, 487 U.S. 1205, 108 S.Ct. 2847, 101 L.Ed.2d 884 (1988). In *Meyers I*, the Board articulated the following test: "In general, to find an employee's activity to be 'concerted,' we shall require that it be engaged in with or on the authority of other employees, and not solely by or on behalf of the employee himself." *Meyers I*, 268 N.L.R.B. at 497. In *Meyers II*, the Board explained that "[this definition] encompasses those circumstances where individual employees seek to initiate or to induce or to prepare for group action, as well as *individual employees bringing truly group complaints to the attention of management.*" *Meyers II*, 281 N.L.R.B. at 887 (emphasis added).

We conclude that the A.L.J. erred by relying exclusively upon this language from *Meyers II* in evaluating Fields' conduct to determine whether it was concerted. The Board's reference in that opinion to "bringing truly group complaints to the attention of management" must be read in context with its earlier emphasis on the need for proof that an employee was acting "with or on the authority of" other employees, or at least on their behalf. This court has never held that an employee's action in merely repeating the jointly held concerns of other employees,

standing alone, suffices for a finding of concerted action. Indeed, the Board itself in the *Meyers* cases rejected the similar notion that a single employee's safety complaint was per se concerted because it was of common concern to the group. *See Meyers I*, 268 N.L.R.B. at 496 (rejecting *Alleluia Cushion Co.*, 221 N.L.R.B. 999 (1975)); *Meyers II*, 281 N.L.R.B. at 884–85 (reaffirming *Meyers I*). The Board's theory in this case cuts close to this concept of "constructive concerted activity," which has been rejected both by the Board and by this circuit. *See id.; Jim Causley Pontiac v. NLRB*, 620 F.2d 122, 126 n. 7 (6th Cir.1980), *appeal after remand*, 675 F.2d 125, 125 (6th Cir.1982).

█ An inquiry into the concerted nature of conduct should not focus solely upon the group nature of the complaints. Instead, it also should air what the employees decided to do about those complaints. Here, while there was evidence that drivers were irritated by working conditions, there is nothing to indicate that they had decided to act upon those annoyances. Nor is there any evidence that Fields was acting in anyone's interest but his own on January 4. Accordingly, the Board's finding that Fields' January 4 complaints were concerted activity is not supported by substantial evidence on the record considered as a whole.

### III.

█ In addition, the A.L.J. found that Fields' January 11 discussion with Merkel about sick pay and his expressed intent to speak to management about the issue also rose to the level of concerted activity. In support of this conclusion, General Counsel for the Board cites this court's decision in *NLRB v. Evans Packing Co.*, 463 F.2d 193 (6th Cir.1972). There, a group of employees was discussing the subject of overtime pay when a foreman entered. One employee "spoke up and asked what [the foreman] 'could do about getting us paid overtime....'" *Evans*, 463 F.2d at 194. The foreman replied that there was nothing he could do and that the employee would have to contact higher management. The day after the complaining employee spoke to another foreman, he was discharged. This court

concluded that the employee's complaints were concerted. *Id.* at 194–95.

In the instant case, testimony about the sick pay incident was conflicting. Fields himself testified that he wondered aloud how sick pay was paid but that before anyone had a chance to reply, Robin Merkel entered and Fields said "here's our answer now." In addition, Fields referred to David Morrow, who was one of the other two employees present, as a bystander to the conversation. Morrow himself stated that he did not care about sick leave because he had already used all his sick days. The third employee involved in the discussion was not asked about it.

The A.L.J., however, credited Merkel's account that it was Morrow who told Fields to ask her about sick leave. Even accepting this as fact, the Board exaggerates when it characterizes the episode as a "protest." Furthermore, the Board's description of Morrow as having actively participated in the conversation lacks support in the record.

In *Evans,* the evidence was clear that the complaining employee was speaking on behalf of others who were equally concerned about overtime pay. Here, by contrast, there was little, if any, conversation before Merkel entered, and one employee expressly disavowed an interest in the topic of sick pay. To the extent others were curious to hear Merkel's response, their interest was directed at clarifying and understanding the company's sick pay policy, not in complaining about it. Although Fields took offense at the answer he received, the evidence does not show that the others shared his reaction or joined in the objections he voiced to Merkel. Accordingly, the record contains inadequate support for a conclusion that Fields' questioning of Merkel about sick pay constituted concerted activity.

■ As an additional rationale, the A.L.J. concluded that Morris discharged Fields in part for refusing to set up a group meeting, which infringed upon Fields' "right to refrain" from protected, concerted activity. *See* 29 U.S.C. § 157. The Board did not rely upon this theory of liability, and General Counsel cites no case law supporting such a theory. At any rate, we cannot agree with the A.L.J. that Morris' reference in his discharge letter to Fields' refusal to set up a meeting demonstrated an intent to punish him for refraining from protected activities. Rather, the letter more likely reflected Morris' exasperation that, after conveying his problems so pointedly, Fields was unwilling to be part of the solution to those problems.

In view of our conclusion that Fields' conduct on January 4 and 11, 1991, was not concerted, we need not address the question whether concerted activity motivated his discharge. *See NLRB v. Ogle Protection Serv., Inc.,* 375 F.2d 497, 505 (6th Cir.) (employer may discharge employee "for any reason, whether it is just or not," as long as it is not for protected activity), *cert. denied,* 389 U.S. 843, 88 S.Ct. 84, 19 L.Ed.2d 108 (1967).

### IV.

For the foregoing reasons, enforcement of the decision and order of the Board is **denied.**