**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**United Steelworkers of America, Intervenor,**

v.

**TALSOL CORPORATION, Respondent.**

No. 97-5443.

United States Court of Appeals, Sixth Circuit.

Argued April 30, 1998.

Decided Sept. 10, 1998.

789

James A. Mills (argued and briefed), Denlinger, Rosenthal & Greenberg, Cincinnati, OH, for Respondent.

Jeffrey Horowitz (argued and briefed), Frederick C. Havard (briefed), National Labor Relations Board, Appellate Court Branch, Washington, DC, for Petitioner.

Before: JONES, MOORE, and COLE, Circuit Judges.

NATHANIEL R. JONES, Circuit Judge.

The National Labor Relations Board ("Board") petitions for enforcement of its order finding Talsol Corporation guilty of unfair labor practices. The Board adopted the conclusions of the administrative law judge ("ALJ") that Talsol violated §§ 8(a)(1), (3) and (5) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. § 158(a)(1), (3) and (5). Talsol contests only three of the Board's findings, and the Board seeks summary enforcement of its remaining findings of violations on the part of Talsol. Therefore, by virtue of a failure to contest findings, or explicit concessions with respect to others, or findings supported by substantial evidence, the summary judgment warrants enforcement and we order the same.

Respondent Talsol Corporation is an Ohio corporation that manufactures and sells automotive paint products to automobile dealers, repair shops, wholesalers and retailers throughout the United States and Canada. Talsol operates a plant in Union Township, Butler County Ohio, which employs approximately 40 workers and which serves as the location for all of the events at issue in this case.

In March 1991, the United Steel Workers of America, AFL–CIO–CLC ("the Union") began an organizing campaign at Talsol. As a result of this campaign, Talsol began a series of unfair labor practices designed to threaten, intimidate and retaliate against pro-union employees and activities. Thereafter, the Union, as well as several individual Talsol employees, filed a series of complaints against Talsol charging that between April 17, 1991 and September 1, 1992, Talsol committed various unlawful labor practices in violation of NLRA §§ 8(a)(1), (3) and (5). On May 10, 1991, while some of these charges were pending, the Board held an election on Union certification which the Union won 20 to 16.[1] As a result, on August 12, 1991, the Union was certified as the Talsol employees' exclusive bargaining representative.[2]

In October 1992, the Board consolidated all of the various charges against Talsol into one complaint and scheduled a hearing before an ALJ. The hearing began on January 27, 1992, and after various recesses concluded on December 9, 1992. On December 30, 1993, the ALJ issued a decision sustaining the majority of the Union's allegations of unfair labor practices against Talsol.[3] Talsol filed

1. The initial results were 17 votes for the Union, 16 against, with four challenged ballots. After a review of the challenged ballots, one was sustained, and the other three were thereafter counted. Joint Appendix (J.A.) at 91.

2. Specifically the unit was certified as to:

All full-time and regular part-time production maintenance employees employed at the Employer's Union Township, Ohio facility, including all warehouse employees, shipping clerks, packers, shipper/pickers, paint makers and color matchers, but excluding all office clerical employees, laboratory employees, salesman [sic], temporary employees, and all

professional employees, guards, and supervisors as defined in the Act.
*Id.* at 16.

3. Talsol was found liable for "physically and verbally threatening employees, threatening retaliation, threatening to reduce wages, threatening or predicting loss of benefits, plant closure, loss of jobs, more onerous working conditions, disciplinary actions, assignments to harder jobs, interrogating employees, imposing restrictions, rescinding privileges, denying union representation to employees during disciplinary interviews, creating the impression that employees' union activities were under surveillance, promulgating rules, and harassing employees" in violation of

timely objections to the ALJ's decision, and on May 8, 1995, the Board overruled Talsol's objections and affirmed the decision. The Board then filed this timely petition for enforcement pursuant to 29 U.S.C. § 160(e).

Of the numerous violations of the NLRA found to have been committed on the part of Talsol by the ALJ and affirmed by the Board, Talsol contests only three findings here: 1) that it unlawfully withheld wage review and increases in June 1991 in violation of NLRA §§ 8(a)(1) and (5); 2) that it discharged employee Darryl Denham in violation of NLRA § 8(a)(1) because of his concerted activities; and 3) that it discharged employee Pam McNew in violation of NLRA §§ 8(a)(1) and (3) because of her pro-union activities. We will address each issue in turn.

## I. Background

### A. Wage Increases

It is undisputed that prior to the May 1991 election of the Union at Talsol, Talsol had conducted annual employee evaluations in the Spring of each year. Also undisputed is that following these evaluations, employees received wage increases in June of each year. Subsequent to the May 10, 1991 election, however, on May 31, 1991, Talsol attorney Gary Greenberg sent the Union a letter noting that in previous years it had reviewed employees for "discretionary" wage increases, but that in that year Talsol believed that it should not grant increases "because of its legal obligation to maintain the status quo pending negotiations." J.A. at 286. The letter indicated that if the Union wished to discuss the issue it should let Greenberg know, and concluded by recognizing that Talsol was obligated to bargain over wage rates and other conditions of employment and that the company would do so in good faith. *Id.* Finally, the letter instructed the Union to contact Greenberg to set up the first meeting.

The Union wrote Talsol in response on June 5, 1991, urging Talsol to follow its prior practice of granting wage increases. *Id.* at 287. The Union noted that although it expected to be certified in the near future, negotiations had not yet started. On June 7, 1991, Talsol sent the Union another letter proposing that because the Union would be certified and would be negotiating wages and benefits, "the June wage reviews be postponed pending negotiations for a contract." *Id.* at 288. In this letter, Talsol offered to meet with the Union and noted that it was willing to do so before the Union was formally certified. On June 24, 1991, Talsol sent the Union another letter proposing to increase the wages of three paint makers. In response to this letter, the Union sent Talsol a letter stating that Talsol had rejected the Union's proposal to continue the prior practice of June wage increases, and thus the Union was rejecting Talsol's proposal to make an exception for the three paint makers. In this letter, the Union stated that all employees were entitled to wage increases, and that it was "ready and willing to negotiate wages and benefits for all bargaining unit employees." *Id.* at 289. Talsol informed the Union the next day that it would nonetheless increase the wages of the three paint makers.

A formal meeting between Talsol and the Union did not occur until November 13, 1991. Wages and benefits were not discussed at this meeting and Talsol's employees were never given their annual wage increases for 1991.

In deciding whether Talsol's discontinuance of the wage increase program the year the union was elected amounted to a violation of the NLRA, the ALJ found that it was Talsol's prior practice to give evaluations and award wage increases every June. He found

---

NLRA § 8(a)(1). J.A. at 102. Talsol was also found liable for warning/reprimanding five employees, warning/suspending three employees, reducing or docking two employees' wages, transferring eleven employees, and discharging seven employees in violation of NLRA §§ 8(a)(1) and (3). *Id.* Further, Talsol was found liable for layoffs of employees, subjecting certain employees to oppressive working conditions and undue

restrictions in violation of NLRA §§ 8(a)(1) and (3). *Id.* Finally, by "requiring employees to take physical examinations and drug tests, by punishing an employee for allegedly failing a drug test ..., by unilaterally imposing a new system of layoffs and changing work hours" and by refusing to bargain with the Union, Talsol was found to have violated NLRA §§ 8(a)(1) and (5). *Id.*

that Talsol's letters to the Union indicating its purported willingness to bargain were of very little import because the Union had not been certified at that time. The ALJ noted that if Talsol or the Union had entered in negotiations in June over the issue, before certification of the Union, they would arguably have violated the law. Additionally, the ALJ found that the wage review program was a term and condition of employment, and that it had been unilaterally changed by Talsol. The Board, in affirming the ALJ's decision in this regard, also noted that Talsol had a pre-existing program of reviewing employee performance in the Spring and awarding raises in June. Finally, the Board found that the May 31 letter, in which Talsol informed the Union that it would not be awarding raises in June, was belated and did not give the Union reasonable notice and an opportunity to bargain. *Id.* at 101.

## B. Discharge of Darryl Denham

Darryl Denham began his employment at Talsol on September 16, 1991, as a shipping clerk, under the supervision of Larry Parsons. Shortly after commencing his employment, Denham noted an Occupational Safety & Health Administration (OSHA) report posted over the time clock.[4] Denham questioned several fellow employees about the OSHA report and safety conditions at the plant. He also told employees that Talsol's shelving system and equipment were not safe. On September 25, 1995, Talsol's Safety Director, Teresa Case, and other members of Talsol management, conducted a safety meeting attended by Denham and other Talsol employees. The meeting consisted of a slide show and distribution of literature on plant safety. After the presentation, Denham asked several questions regarding plant safety at Talsol. Denham, who through a prior position had previous experience with some of the chemicals used at Talsol, challenged Talsol's representations concerning the safety and health hazards of certain chemicals. He also inquired about the OSHA report. Talsol management responded to Denham's inquiries by stating that they disagreed with the findings in the OSHA report, and by assuring Denham that Talsol maintained a safe work environment. Denham did not accept this reassurance; instead, he continued his inquiries regarding safety at Talsol, questioning the training in handling and storage of chemicals and the lack of posted fire evacuation plans. He also requested his own personal copy of the OSHA report. Denham described Case as pleasant at the start of the meeting, but irritated and visibly angry by the end of the session. None of the other employees present at the meeting asked any questions.

On September 27, 1991, two days after this safety meeting, Denham's immediate supervisor Larry Parsons, left work early and told Denham that he would see him the next day. After Parson's departure, Denham was called into the office of Jim Zimmerman, a supervisor of Talsol's paint makers, who informed Denham that his employment was terminated. In response to Denham's inquiry as to the reason for his termination, Zimmerman initially refused to provide him with any reason and simply instructed Denham to get his property and leave the premises. Eventually, Zimmerman merely stated that Denham's firing was a management decision.

At the administrative law hearing on Denham's discharge, Parsons testified that Denham's job performance was not up to his expectations and that he had been willing to give Denham, who had not been at work more than two weeks, a little more time to improve. Zimmerman testified that one factor leading up to Denham's dismissal was that Denham had attempted to supervise one of Zimmerman's employees by telling the employee to move some stock. On cross-examination, Zimmerman admitted that Denham had merely told Zimmerman's employee to move the stock so that Denham could retrieve some stock behind it. Zimmerman had apparently informed David Blizzard, a Talsol Vice–President, and Parsons of the incident. Blizzard also apparently became irritable with Denham because "if [Talsol had] needed another foreman [it] would have hired one." J.A. at 448. Denham, however, testified that during his time at Talsol, he had inquired of Parsons on a daily basis as to his performance and that Parsons always announced that Denham's work was fine.

4. In May 1991, after a formal complaint by employee Pam McNew, whose discharge is involved in this appeal, OSHA inspected Talsol and prepared a report on safety issues in the plant.

He also testified that he had never been warned about any deficiencies in his work.

The ALJ noted the various discrepancies in the Talsol testimony. He noted that the decision to terminate Denham must have been made after Parsons left work early on the 27th, but that the alleged incident with Denham and Zimmerman, as well as any inadequate performance on Denham's part, had occurred much earlier. Thus, the ALJ wondered why Blizzard waited until Denham's immediate supervisor, who was responsible for his discipline and discharge, was gone, thereby requiring Zimmerman to terminate Denham without witnesses. The ALJ also found the incidents leading to Denham's discharge to be "really petty matters." Thus, the ALJ found the discharge illogical even under Talsol's "draconian" discipline policies. Accordingly, the ALJ determined that Denham's conduct in the safety meeting was protected concerted activity and that Talsol had discharged Denham because of it. The ALJ found that this violated § 8(a)(1) of the NLRA. The Board affirmed.

## C. Discharge of Pam McNew

Prior to Pam McNew's termination from Talsol, she was an acknowledged Union supporter. McNew was listed by the Union as an in-plant organizer in an April 15, 1991 letter to Talsol and became a member of the Union's bargaining committee after its certification. Additionally, in 1991 it was Pam McNew who had initially filed a formal complaint against Talsol with OSHA, which led to the inspections of Talsol's plant and a report on the conditions at Talsol.

McNew originally worked on Talsol's aerosol line,[5] but in May 1991 became ill due to the excessive heat in the room and was forced home. After the incident, and an examination by Talsol's physician, Blizzard accused McNew of lying about her condition and the visit to Talsol's physician, and termi-nated McNew from her position. McNew, however, contacted OSHA about her termination and was reinstated pursuant to an agreement with OSHA and Talsol. She returned to work on the aerosol line on June 3, 1991.

On August 19, 1991, while McNew was supplying boxes to the conveyor belt, two boxes fell from the belt. McNew's supervisors told her that if it happened again McNew would be reprimanded. Later that day, however, her supervisors returned and suspended McNew for three days because of the incident. On August 26, 1991, McNew reported back to work, but complained of shoulder pain which had been bothering her for some time. Shortly thereafter, she visited a doctor who diagnosed McNew as having shoulder strain and tendinitis. McNew immediately informed Talsol that she could not return to work until fully released without restrictions from her doctor. She then filed a claim for worker's compensation, which Talsol claimed it never received. On September 9, 1991, Talsol informed McNew that because she had not filed a worker's compensation claim concerning her injury, her absence would not be treated as a work-related injury, and thus she would be discharged for her missed days. Talsol rescinded this decision after McNew provided conclusive proof that she had in fact filed a worker's compensation claim. On December 19, 1991, eighteen weeks after McNew last worked, Talsol discharged her, citing her excessive absenteeism because she had not reported to work since August 26, 1991.

At the administrative hearing on this issue, Talsol asserted that it had a company policy of discharging employees who were on leave of absence for longer than thirteen weeks and who had not provided a written estimate of a return time. In this regard, Talsol presented a list which purported to show all employees discharged after extended leaves of absence.[6] Talsol also maintained that

---

**5.** The aerosol line (or warehousing and assembly line) is operated separately from other areas of the plant. J.A. at 71. The system is mostly automated and requires only four employees, one to load cans on the line, one to install valves, one to cap, and one to box and unload the line. *Id.* A number of other charges in this case, not at issue in this appeal, involved the aerosol line. There were several charges that employees were trans-ferred to the line because of their Union or concerted activities; that onerous working conditions on the line were imposed because of Union activities; and that there were layoffs and disciplinary actions against aerosol line employees. These were also found to be unlawful labor practices. J.A. at 72–81.

**6.** The exhibit listed the names of seven employees, including Pam McNew, who were allegedly

McNew should have reported the injury earlier, and that because McNew had not worked on the aerosol line for the entire time before her injury, it could not have been caused by overwork on the line. Further, Talsol presented the testimony of a physician who stated that boxing and packing cans could not have caused McNew's injury. Although McNew had provided documentation by two other physicians who found differently, the Talsol physician determined that McNew could not have received the injury she described from work on the aerosol line and that these two other doctors had made incorrect diagnoses. The ALJ noted that Talsol's list of discharged employees did not indicate whether it included employees absent because of work-related injuries, and also did not indicate whether there were any employees who had not been discharged for being on leave of absence or work related injury leave. Additionally, the ALJ placed little weight on the figures that were provided by Talsol, noting that Talsol management had not been forthright in other areas. The ALJ further determined that Talsol's claim that it maintained a firm policy of discharge after thirteen weeks was not supported by substantial evidence. The ALJ also made a credibility determination against Talsol management regarding McNew's employment in the aerosol room and the staffing therein. Further, the ALJ questioned the Talsol physician's objectivity. Thus, the ALJ found that Talsol had not overcome McNew's prima facie case that her Union activities motivated her discharge. The ALJ found that Talsol had not established by a preponderance of the evidence its policy of discharging all employees after thirteen weeks of absence, and therefore Talsol's discharge of McNew violated the NLRA.

## II. Legal Analysis

### A. Standard of Review

 The main issues on appeal all involve the Board's determination that Talsol violated provisions of the NLRA. In this regard, we sustain the Board's findings of fact so long as "they are supported by substantial evidence on the record viewed as a whole." *NLRB v. Pentre Electric, Inc.*, 998

F.2d 363, 368 (6th Cir.1993). "We also review the Board's application of the law to particular facts under the substantial evidence standard." *Id.* Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.; see also Adair Standish Corp. v. NLRB*, 912 F.2d 854, 859 (6th Cir.1990). "Where the evidence supports two conflicting views, we may not disturb the Board's findings and its order must be enforced." *W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 870 (6th Cir.1995). Moreover, "credibility determinations must be accepted unless it is clear that there is no rational basis for them." *NLRB v. Valley Plaza, Inc.*, 715 F.2d 237, 242 (6th Cir.1983); *see also Adair Standish*, 912 F.2d at 860 ("[I]t is the Board's function to resolve questions of fact and credibility where there is a conflict in testimony.").

### B. Uncontested Findings

 The Board seeks summary enforcement of numerous findings of unfair labor practices on the part of Talsol which have not been challenged on appeal. An employer's "failure to address or take issue with the Board's findings and conclusions with regard to ... violations [of the Act] effectively results in abandonment of the right to object to those determinations." *NLRB v. Kentucky May Coal Co., Inc.*, 89 F.3d 1235, 1241(6th Cir.1996); *Valley Plaza*, 715 F.2d at 240–41. Therefore, the employer will have "effectively admitted the truth of those findings." *Kentucky May Coal*, 89 F.3d at 1241. In such cases, courts may summarily enforce the Board's order with regard to those issues. *See NLRB v. Champion Laboratories, Inc.*, 99 F.3d 223, 227 (7th Cir.1996); *Woodline Motor Freight, Inc. v. NLRB*, 843 F.2d 285, 287 (8th Cir.1988). In addition, "[t]he uncontested violations ...'do not disappear altogether. They remain, lending their aroma to the context in which the contested issues are considered.'" *Champion Laboratories*, 99 F.3d at 227 (quoting *Rock–Tenn Co. v. NLRB*, 69 F.3d 803, 808 (7th Cir. 1995)).

discharged for excessive absenteeism ranging from 18 weeks to 23 weeks.

Here, the Board found that Talsol had engaged in numerous violations of §§ 8(a)(1), (3) and (5) of the NLRA. *See supra* note 3. Talsol has wholly failed to contest any of these numerous findings of violations on appeal, and indeed has explicitly conceded some of these findings. Accordingly, these findings are all entitled to summary enforcement. In addition, when determining whether the charges which are contested on appeal are supported by substantial evidence, the court does not make such an inquiry in a vacuum, but in light of these numerous uncontested violations on the part of Talsol, which are strong direct evidence of Talsol's hostility toward unionization. *See Abbey's Transp. Serv., Inc. v. NLRB*, 837 F.2d 575, 580 (2d Cir.1988); *Purolator Armored, Inc. v. NLRB*, 764 F.2d 1423, 1428–29 (11th Cir. 1985).

## C. Discontinuance of Wage Increase Program

On appeal, Talsol argues that substantial evidence does not support the Board's finding that it violated § 8(a)(5) of the Act when it decided not to implement wage increases in June 1991. Talsol asserts that it informed the Union through its May 31 letter that it was postponing wage increases until negotiations began with the Union. Talsol contends that this letter expressly provided that it was willing to bargain with the Union, and because the Union did not attempt to conduct any bargaining concerning the wage increase, it thereby waived any objections to Talsol's decision. In addition, Talsol contends that the wage increases were wholly discretionary and not a condition of employment requiring bargaining.

NLRA §§ 8(a)(1) and (5) state in pertinent part:

> It shall be an unfair labor practice for an employer—
>
> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
> ... (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

29 U.S.C. §§ 158(a)(1) and (5). It is well-settled that "an employer may not unilaterally change its employees' wages or other working conditions when it is subject to the statutory duty to bargain with a designated representative of its employees." *NLRB v. Allied Products Corp.*, 548 F.2d 644, 652 (6th Cir.1977); *see also NLRB v. Katz*, 369 U.S. 736, 742–43, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). This is so even if the Union has only won an election, but has not yet been certified as the bargaining representative of the company's employees. *See Allied Products Corp.*, 548 F.2d at 653. Any such unilateral change without bargaining is a violation of § 8(a)(5), because it triggers a change in the status quo. *Hyatt Corp. v. NLRB*, 939 F.2d 361, 370 (6th Cir.1991). The critical inquiry is whether there existed an established practice or status quo. In conducting such an inquiry, the court looks to whether "a practice [was] longstanding ..., whether the employer has created an expectation on the part of employees, [and] whether an employer has announced a policy or taken other action consistent with a formal policy change." *Id.* at 371. In addition, even if some discretionary components are involved in a wage increase, when the criteria for determining discretionary wage increases are fixed, the company must "continue to apply the same criteria and use the same formula for awarding increases" as done previously. *See Daily News of Los Angeles v. NLRB*, 73 F.3d 406, 412 (D.C.Cir.1996); *see also Hyatt Corp.*, 939 F.2d at 369.

If the Union is given the opportunity to bargain and chooses not to do so, however, no violation will be found because the Union is deemed to have waived its right to bargain. *YHA, Inc. v. NLRB*, 2 F.3d 168, 172 (6th Cir.1993). "Waiver will be found if the evidence shows that the Union received sufficient notice of the proposed change, and yet failed to protest or demand bargaining on the issue. The Board requires proof of clear and unequivocal notice such that the Union's subsequent failure to demand bargaining constitutes a 'conscious relinquishment' of the right to bargain." *NLRB v. Henry Vogt Mach.*, 718 F.2d 802, 806 (6th Cir.1983)(internal citation omitted).

The ALJ found that Talsol had unilaterally changed the status quo without an opportunity to bargain. Additionally, the Board found

that Talsol had a preexisting practice of reviewing employee performance in the spring of the year, and awarding raises to worthy employees in June. The Board further found that the May 31 letter in which Talsol informed the Union it would not be awarding raises in June 1991, was belated and did not give the Union reasonable notice and an opportunity to bargain. We agree.

Talsol's May 31 letter was a complete oxymoron. In the first sentence of the second paragraph, Talsol expressly acknowledged that the prior practice or status quo was to review employees for wage increases in June. In the very next sentence, however, Talsol states that it believes it should not do so that year because of its legal obligation to maintain the status quo. These statements cannot be reconciled. The undisputed status quo was the wage review and increase in June as expressly acknowledged in Talsol's letter, and to maintain the status quo would have been to maintain the wage increase program. The letter makes clear that Talsol knew its obligation to maintain the status quo, and moreover, even knew what the status quo was—the wage increase program. Talsol's discontinuance of the program was an obvious violation of the NLRA.

Talsol cites *Stone Container Corp.*, 313 N.L.R.B. 336, 1993 WL 496575 (Nov. 24, 1993), a Board decision with no binding force in this court, for its proposition that the Union waived its objection to the postponement of the wage increase by failing to negotiate when Talsol sent its May 31 letter. In *Stone Container*, the Board affirmed an ALJ's decision to dismiss allegations that the company had violated § 8(a)(5) of the Act by discontinuing wage increases. *Id.* at *1. The company had normally granted annual wage increases to its hourly employees in April. On March 22, the Union indicated that it would not protest the grant of the wage increase in April. On March 23, the parties discussed the April increase, and the company indicated that it could not grant the increase because of economic reasons. *Id.* The company then informed the Union that it would provide a complete economic proposal in April. In response, the Union made no specific proposals for the April wage increase and did not raise the issue again during negotiations. Thus, the Board found that a full discussion on the April wage increase occurred at the March 23 meeting, and the company therefore had not refused to bargain with the Union. The Board found that because the wage increase was a discrete event occurring annually, bargaining over the amount could not await an impasse in the overall negotiations. *Id.* The Board further found that the company had "expressed its willingness to discuss the subject, conducted its 'annual wage and benefit survey,' and proposed giving no wage increase [because of] financial circumstances." *Id.* Thus, the Board found that although the company "made its proposal in time for bargaining over the matter if the Union wished to bargain, the Union made no counterproposal ... and did not raise the issue again during negotiations." *Id.*

*Stone Container* is readily distinguishable from the present case, however, because here, the parties were not in negotiations when Talsol decided to discontinue the wage increase program. Indeed, the Union had not yet been certified, and the ALJ correctly pointed out that technically it would have been unlawful for the Union to conduct bargaining at that point. In addition, Talsol, unlike the company in *Stone Container*, did not continue its process of conducting the annual evaluations upon which the raises were determined. Thus, it is apparent from the record that Talsol had already determined not to grant the wage increase before May 31, and merely informed the Union of that change in the May letter. Although Talsol may have indicated its willingness to bargain over a general contract in the future, its letter, which was sent after the company's customary wage increase, gave no indication that the discontinuance of the wage increase program was actually negotiable.

In addition, Talsol spends some time arguing that the wage increases were wholly discretionary. There was testimony by Talsol management that there was no formula for determining whether an employee received a wage increase; that it was completely within Talsol's discretion to decide which employees received wage increases; and that wage increases were granted at other times of the year. There was also testimony, however,

from a Talsol employee who had worked for the company since 1987, that wage increases were given every June 1st. J.A. at 376. The employee testified that employees would be evaluated in May, and the raise would come out on June 1st or the first full pay check after June 1st. J.A. at 376. Additionally, we do not disregard the fact that Talsol conceded that it had a prior practice of reviewing employee performance in the spring of each year and awarding wage increases in June. Moreover, the ALJ noted that in 1990, 24 employees received raises in June and 15 received raises in June 1989. However, from 1987 to the time of the hearing, only six employees received raises at times other than in June. J.A. at 91. Given the numerous violations by Talsol, the ALJ justifiably credited the testimony of Talsol employees over that of Talsol management regarding the standard practice of the wage increase program. Accordingly, substantial evidence supports the Board's finding that there was an established wage increase program occurring annually, and that Talsol violated §§ 8(a)(1) and (5) by unilaterally deciding not to grant the increase in response to the union activities at the plant once the Union had won the election.

### D. Discharge of Darryl Denham

 Talsol also contests the Board's finding that it discharged employee Darryl Denham due to his concerted activities. Talsol does not dispute that it may have been motivated by anti-union animus, but argues that Denham's complaints were not concerted because he acted alone and not on behalf of any group of employees. An unfair labor practice occurs in violation of the NLRA § 8(a)(1) when an employer "interfere[s] with, restrain[s], or coerce[s] employees in the exercise of" their rights to "form and join unions and to 'engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.'" *Manimark Corp. v. NLRB*, 7 F.3d 547, 549 (6th Cir.1993). In order to establish a violation, "the Board must show that the employee was engaged in such protected concerted activity, that the employer knew of the activity and its concerted nature, and that the employee's protected activity was a motivating factor prompting some adverse action by

the employer." *Id.* at 549–50 (internal quotation marks and citation omitted). For an individual's complaints to constitute concerted action, this court requires that the complaints "must not have been made solely on behalf of an individual employee, but [they] must be made on behalf of other employees or at least with the object of inducing or preparing for group action." *Id.* at 550 (internal quotation marks and citation omitted); *see also Compuware Corp. v. NLRB*, 134 F.3d 1285, 1288 (6th Cir.1998) ("Activity is concerted 'if it is related to group activity for the mutual aid or protection of other employees.'") (citation omitted). Workers, however, are not required to have formally chosen the complaining employee as their spokesperson, as long as the employee is at least impliedly representing the views of other employees. *Manimark*, 7 F.3d at 550. A single employee's safety complaint, on the other hand, is not per se concerted simply because it is of common concern to the group. *Id.* at 551. Instead, "the relevant question is whether the employee acted with the purpose of furthering group goals." *Compuware*, 134 F.3d at 1288.

Talsol primarily relies on *Manimark* for its argument that substantial evidence does not support the Board's finding that Denham was engaged in concerted activity. In *Manimark*, the court found that the Board's determination that an individual employee, Hurley Fields, was engaged in concerted activity when he spoke to management concerning his dissatisfaction with wages, hours and other working conditions was not supported by substantial evidence. *Manimark*, 7 F.3d at 550. The court found that there was no connection to the employees and Fields merely because Fields made complaints that were matters of concern to both him and the group. *Id.* The court noted that the conversation between Fields and management regarding wages occurred when Fields went to a manager's office alone, and only came about when he objected to a change in his own commission. *Id.* The court found that the conclusion that Fields was acting concertedly was further undermined because there was no evidence that he had ever told any of the other employees of his intended actions or made complaints on their behalf. *Id.*

Thus, *Manimark* did not involve an employee in a group meeting context, but a much different situation where an employee acted alone in seeking out management and advancing his individual concerns.

We believe the case *sub judice* more closely mirrors *Rockwell International Corp. v. NLRB*, 814 F.2d 1530 (11th Cir.1987). In *Rockwell*, the court noted that "[p]urely personal griping does not fall within the scope of protected concerted activity." *Id.* at 1535. Nevertheless, the *Rockwell* court affirmed a finding of concerted activity based on statements made during an employee meeting. In that case, during an employee meeting, a member of management had lectured employees about the volume of the radio headsets worn by employees. One employee objected, responding that she did not believe the headsets were loud. In addition, this employee commented on another common issue of concern to employees, noise in the workplace. *Id.* The Eleventh Circuit found that substantial evidence supported the Board's finding that this was concerted activity because the employee's concerns were group concerns. Moreover, because the company had called the employees together to discuss the noise issue, that issue was not limited to a single employee. *Id.* The court also noted that the ALJ had found that the company had acknowledged that by raising the issue of the volume of employee radios, the employee spoke on behalf of all employees. *Id.* The court noted that the employee had voiced a concern common to the employees in the group meeting, and that "[w]hile her speech was not 'specifically authorized,' the group was more than generally aware of her actions, since they were present at the meeting." *Id.*

Here, Denham's challenges to the safety measures occurred after he questioned various employees concerning safety at the plant and during a group meeting with other employees and management. In this group meeting, conducted specifically to address safety issues at the plant, Denham challenged Talsol's safety measures and Talsol's own explanations concerning safety at the plant. Furthermore, Denham asked what the company was doing to correct the earlier OSHA citations and inquired about the lack of training in handling and storing merchandise, as well as the lack of a fire evacuation plan for the plant. Clearly, these questions concerned the safety of the plant and were not purely personal gripes from Denham. In fact, they were for the mutual aid and protection of Denham's co-workers and furthered an interest which they had sought to protect. *See Compuware,* 134 F.3d at 1288–89 (holding that no specific authorization was needed to show concerted activity where an employee had "almost from the beginning of his employment ... discussed ... problems with other employees" and made objections on behalf of other employees for their mutual aid or protection). Finally, as noted, these comments were made at a group meeting and attended by employees and Talsol management. Thus, Talsol was very aware that Denham's conduct might induce these employees to act. Substantial evidence therefore supports the Board's findings in this regard.

### E. Discharge of Pam McNew

An employer violates § 8(a)(3) of the Act when it "discriminate[s] in regard to hiring or firing to discourage membership in any labor organization." *See Carrier Corp. v. NLRB,* 768 F.2d 778, 782–83 (6th Cir. 1985). Thus, "if the employer fires an employee for having engaged in union activities and has no other basis for the discharge, or if the reasons that he proffers are pre-textual, the employer commits an unfair labor practice." *NLRB v. Transp. Management Corp.,* 462 U.S. 393, 398, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). Once the employer has asserted that it has laid off an employee for legitimate reasons, the Board has the burden to "make a prima facie showing sufficient to support the inference that protected conduct was a 'motivating factor' in the employer's decision." *Dayton Typographic Serv., Inc., v. NLRB,* 778 F.2d 1188, 1192 (6th Cir.1985). If the employer's "opposition to protected activity has been shown to be a motivating factor in a decision to take adverse action against an employee, the employer will be found to have violated the Act unless it is able to demonstrate that the adverse action would have taken place even in the absence of protected conduct." *NLRB v. E.I. Du-Pont De Nemours,* 750 F.2d 524, 529 (6th

Cir.1984); *see also Birch Run Welding & Fabricating, Inc. v. NLRB,* 761 F.2d 1175, 1179 (6th Cir.1985). Additionally, the NLRB may rely on circumstantial evidence and may infer unlawful intent from the circumstances surrounding a discharge. *Id.* at 1179. Moreover, the "Board's inference of improper motivation must be upheld if it is reasonable in light of the proven facts." *Id.*

■ Here, we easily find that substantial evidence supports the Board's finding that Talsol discharged McNew due to her union activities. It is apparent that McNew was considered a union troublemaker by Talsol management and undisputed that she was a known union sympathizer. In fact, the record shows that Talsol attempted to "get rid" of McNew on several occasions. She was unlawfully transferred to the aerosol line in April 1991;[7] harassed because of her union activities;[8] discharged in May 1991 for filing an OSHA report; suspended unlawfully;[9] fired improperly for failing to file a worker's compensation claim that she had in fact filed; and finally, the incident here, discharged purportedly for excessive absenteeism due to a work related injury. Based on this evidence, as well as a credibility determination regarding Talsol testimony and the lack of a firm policy on Talsol's part to discharge employees for work related injuries after thirteen weeks, the ALJ found that McNew had made out a *prima facie* case of unlawful discharge, and that Talsol failed to show that it would have discharged her even in the absence of her Union activities. We believe substantial evidence supports this finding.

■ In so doing, we acknowledge that our decision in *NLRB v. A & T Mfg. Co.,* 738 F.2d 148, 151–52 (6th Cir.1984), found that evidence of prior unlawful labor practices (such as an earlier unlawful decision to fire an employee for union activities) which were not acted upon, could not establish a per se rule that a later discharge was done for an unlawful motive. *Id.* In *A & T,* evidence established that the company had planned to terminate an employee because of his union activities. The company failed to do so im-

mediately, and later an additional, legitimate reason for termination developed. The Board had determined that the earlier evidence of the company's intent to fire the employee because of anti-union animus supported a finding that the company had done so subsequently. *Id.* at 151. This court, however, rejected that argument. This court noted that such a per se factual rule would render it impossible for an employer to adopt an additional, legitimate reason between the time of the earlier determination and the time of the effectuation of the discharge, and "comport[ed] neither with reality nor with the Board's own precedent." *Id.* at 151–52. Thus, the court remanded the case for the Board to determine whether the employee involved would have been discharged even in the absence of his protected union activity. *Id.* at 152. While the case rejected any per se rule of an unlawful discharge based only on an employee's prior misconduct, it did not propose that the ALJ or the Board bury their heads in the sand when confronted by a clear pattern of conduct that was directed at a specific employee and designed to retaliate against that employee because of pro-union activities. While prior acts may not per se establish that a subsequent discharge was improperly motivated, they often do and will provide substantial evidence of a company's anti-union activities. When such evidence is coupled with suspicious timing and no credible evidence of a "policy" concerning the discharge, a *prima facie* case may be found.

Here, Talsol did not provide any type of employee handbook, guide or pamphlet that established a policy of terminating employees after thirteen weeks. Simply listing seven employees who had been terminated for absenteeism, without listing whether they were absent for work related injuries or other reasons, is not sufficient. This list, which gave no indication that the employees were in any way similarly situated to McNew, is thus far from conclusive. Additionally, we generally defer to an ALJ's factual findings regarding "essential credibility determina-

---

**7.** This is a finding of an unfair labor practice that Talsol has not contested on appeal.

**8.** This is another uncontested finding of an unfair labor practice.

**9.** Yet another uncontested finding of an unfair labor practice.

tions" in that regard. *See Tony Scott Trucking, Inc. v. NLRB,* 821 F.2d 312, 315 (6th Cir.1987). The ALJ was permitted not to consider Talsol management's testimony with regard to a policy conclusive on that issue. We do note that Talsol did provide, on appeal, testimony that three of the employees on the list,[10] who were also Union supporters, had filed worker's compensation claims and had been terminated for absenteeism after work related injuries, and that their complaints that their discharges were done because of anti-union animus had been dismissed. There was no evidence, however, to establish why the charges were dismissed, and their complaints were decided by a different ALJ. Moreover, none of these employees was similarly situated to McNew, whose pro-union activities were particularly widespread. Accordingly, substantial evidence supports the Board's finding that Talsol unlawfully discharged McNew in violation of the NLRA.

### III. Conclusion

For the foregoing reasons, enforcement of the decision and order of the Board is **GRANTED.**

---

**10.** Employees Connie Robinson, Treasure Chestnut and Bonnie Wilson. J.A. at 293.