AGEE, Circuit Judge,
concurring in part and dissenting in part:
I concur with the majority opinion that Alton Piester’s comment to “clean out your truck” on January 13 constituted a violation of the National Labor Relations Act (NLRA) based on the standard of review applicable in this case. See Smithfield Packing Co. v. NLRB, 510 F.3d 507, 515 *342 (4th Cir.2007) (“[W]e must defer to the Board where it has chosen ‘between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.’ ”) (quoting Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). However, I write separately because I do not agree with the majority’s conclusion as to the April 2 events. In particular, I do not agree with the majority’s determination that “even though [Darrell] Chapman’s continued protests were presented individually, they were reasonably understood by the Board to be a continuation of the drivers’ mutual decision to take their grievance up with management.” Supra at 340 (internal quotations omitted). Nor do I agree with the majority that whether Chapman “was reiterating the shared employee complaint” is a “close factual issue.” Supra at 340. The evidence in the record plainly shows, as the ALJ found, that Chapman’s complaints on April 2 were directed at his own inability to calculate the fuel surcharge, not the drivers’ collective dissatisfaction with imposition of the fuel surcharge in the first instance. As such, there is not substantial evidence from which to conclude that Chapman was engaged in “concerted” activity at the time of his discharge. Therefore, I respectfully dissent from that portion of the opinion holding that Chapman’s discharge violated § 8(a)(1) of the NLRA.
I.
With respect to Chapman’s discharge claim, the General Counsel alleged “that Chapman engaged in concerted activities with other employees for their ‘mutual aid or protection’ ” during his discussions with Sherry Marntin, Renee Derrick, and Piester on April 2, 2007. J.A. 243. Specifically, the General Counsel argued “that Chapman’s April 2 conduct was a continuation of the employee protests at the January 13 meeting, and therefore protected.”[1] J.A. 246. The ALJ disagreed, finding that “over time, employee discontent with the [fuel surcharge] abated” but “Chapman ... continued to complain about” it. J.A. 245. In particular, the ALJ determined that
[t]he credited testimony establishes that when Chapman spoke with Derrick on April 2, he was concerned that the fuel surcharge amount did not appear on his pay stub. Derrick offered an explanation. Chapman remained unsatisfied and ultimately spoke with Piester.
Chapman spoke only about his own pay and pay documents and not those of any other employee. Additionally, the record fails to establish that Chapman indicated in any way that he intended to speak on behalf of any other employees or that any other employees had asked him to act on their behalf.
The credited evidence does not establish that Chapman said anything which would lead Piester to conclude that he was continuing the earlier protest. Considering the amount of time which had elapsed, it would not be self-evident that Chapman’s complaints, focused solely on his own pay documentation, actually constituted activity on behalf of other employees. I conclude that [Piester] had no reasonable basis to believe that Chapman was acting on behalf of anyone but himself.
*343 J.A. 245-46. According to the ALJ, the two and one-half months between the January 13 meeting and Chapman’s objections on April 2, combined with the lack of evidence that Piester was hostile to the employees’ protest about the fuel surcharge, necessitated the conclusion that the General Counsel did not carry its “burden of showing a link between the protected activity [at the January 13 meeting] and” Chapman’s discharge. J.A. 246.
It is worth noting that in reaching his conclusions the ALJ also made significant first-hand determinations of witness credibility and expressly found that Chapman’s testimony did “not ring true,” was not to be credited, and was not “reliable.” J.A. 241. In contrast, the ALJ found that Derrick’s testimony “merit[ed] the greatest confidence,” and that testimony by Marntin and Piester should be credited. J.A. 245. “We owe deference to such witness credibility assessments.” NLRB v. Mining Specialists, Inc., 326 F.3d 602, 605 (4th Cir.2003) (citing Concrete Pipe & Prods., Inc. v. Constr. Laborers Pension Trust, 508 U.S. 602, 623, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993)); Sam’s Club, a Div. of Wal-Mart Stores, Inc. v. NLRB, 173 F.3d 233, 240 (4th Cir.1999) (“An ALJ’s credibility determinations should be accepted by the reviewing court absent exceptional circumstances.”). The Board did not reject the credibility findings by the ALJ.
Despite the ALJ’s fact and credibility determinations, the Board found that Chapman’s complaints on April 2 were “a continuation of the earlier concerted employee complaints about the adverse change to the fuel surcharge.” J.A. 237. The Board reached this conclusion notwithstanding its determination “that Chapman made an individualized request for a notation on his pay stub” during the April 2 meeting. J.A. 238. According to the Board, “that request was made in the context of his underlying complaints about the fuel surcharge change.” Id. (emphasis added). Based on the record, I do not agree.
II.
During the process of reviewing the entire record for substantial evidence, a reviewing court must not only consider the evidence used to support the Board’s factual conclusion, but it also “must take into account whatever in the record fairly detracts ” from the Board’s factfinding. Universal Camera, 340 U.S. at 487-88, 71 S.Ct. 456, 95 L.Ed. 456. “When the Board purports to be engaged in simple factfinding, ... it is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands.” Allentown Mack, 118 S.Ct. at 829. “Courts performing substantial evidence review, therefore, must examine whether the Board considered all of the reasonable inferences compelled by the evidence in reaching its decision.” Pirelli Cable Corp., 141 F.3d at 514.
Sam’s Club, 173 F.3d at 239-40 (emphasis added).
The Board (and the majority) primarily rely on testimony by Marntin and Derrick as evidence that Chapman reiterated protected group complaints made at the January meeting when he met with Marntin, Derrick, and Piester in April. Chapman’s own testimony, however, aptly illustrates the particular grievance he sought to address with Marntin and Derrick on April 2:
I asked her if she’d pull my record up showing me how things were being paid. And I said, you know I said to myself, I said Sherry [Marntin], there’s no way that’ll work. And she said “what do you mean?”, and I said, “I can’t figure it out ....” And so I walked over to [Derrick] *344 and [Derrick] and I started talking. And I said, “[Derrick], just tell me how you all are doing our payroll, how you’re doing the surcharge on our checks.”
J.A. 94 (emphasis added).
Chapman then described his conversation in Piester’s office this way:
She (Derrick) walks in. She sits across from where I’m sitting. I’m in front of [Piester’s] desk. And she said — he asked her, he said, “What do he want?” [sic] She said, “Well he want the money that we’re talking [sic] out of their check, he wanted it shown on his check stub ”. Alton repeated, “No, we can’t do that”. I said, “Why you can’t do that? You’re taking it out of our check. Why you can’t show it?”
J.A. 96 (emphasis added).
According to the majority, it is “clear” that (1) Chapman repeatedly complained about the effect of the surcharge on “his income,” and that (2) Chapman had been in an ongoing debate with the Company concerning the amount taken from “his paycheck.” Supra at 339. It is patently clear from the context of the testimony, as it was to the ALJ who heard it firsthand, the gravamen of Chapman’s complaint on April 2 was that he did not understand how the surcharge was being calculated (and thus how it was affecting his pay), not the fact that a surcharge was company policy.
Marntin testified that Chapman
was complaining about the fuel surcharge. He had told [Derrick] that he was wanting it to show on his check stub and she advised him she couldn’t put it on his check stub due to he’d be taxed by the IRS and he couldn’t be taxed on money that didn’t belong to him. That wouldn’t benefit him at all.
[Then] he had went back there and him and [Piester] had started discussing it.
J.A. 166.
From this testimony the Board excerpted Marntin’s broad characterization of Chapman’s complaint as being “about the fuel surcharge,” J.A. 237, in total isolation from her specific description of Chapman’s actual, specific complaint during his visit to the company’s office. Moreover, Marntin’s statement that Chapman and Piester were discussing “it” clearly refers to Chapman’s desire to have the information included on his pay stub, as explained by Marntin’s description of the meeting between Chapman and Piester:
[Piester] called [Derrick] back there and told [Derrick] what [Chapman] was wanting. He was wanting the fuel surcharge to show on his checks. [Derrick] explained to [Piester], she said, “That’s going to be the IRS taxing that money and,” she said, “the money don’t belong to [Chapman] anyway, we cannot put it on his check stubs.[”]
J.A. 167-68.
Finally, the ALJ specifically asked Marntin whether Chapman said “anything about just himself or other employees as well as himself’ when he “came in and he talked about his payroll and his paycheck.” J.A. 178. Marntin replied “just himself.” Id. Marntin then reiterated that Chapman “always spoke about his check.”[2] J.A. 179.
*345 The Board likewise read Derrick’s testimony out of context. She testified that Chapman “stood in between our desks and he was complaining about the fuel surcharge and wanted it showed [sic] on his check stub.” J.A. 180 (emphasis added). The Board cited this description as evidence that Chapman was complaining about the fuel surcharge and thus making a group complaint when, in context, Derrick undoubtedly conveyed that Chapman’s purpose in speaking with Derrick was to have the fuel surcharge shown on his pay stub. Derrick’s description of Chapman’s spontaneous meeting with Piester mirrored that of Marntin: “[Piester] called me back there to help him explain what I had already explained to [Chapman], I explained to [Piester] why it couldn’t be on his check stub and explained it again to [Chapman].” J.A. 181.
Piester’s testimony is also consistent with that of Marntin and Derrick. The General Counsel called Piester as a witness and he testified as follows:
Counsel: And when [Chapman] came in, he was talking to you about the fuel surcharge. Isn’t that correct?
Piester: The — yes, sir.
Counsel: Isn’t it true that [your affidavit] says that you were trying to explain how it worked to him, to Mr. Chapman? Isn’t that what it says?
Piester: Yes sir....
Counsel: Isn’t it true that [your affidavit], the bottom line, the last line there says that you were trying to explain how it worked.
Piester: Yes.
Counsel: How the fuel surcharge worked.
Piester: Yes.
Counsel: Okay. Didn’t he ask that it be put on the pay stub so he could see it and figure it out?
Piester: I’m not sure about that now. I’m not sure whether it was on the worksheet or the pay stub.
J.A. 30-35 (emphasis added). This testimony by Piester is utterly in accord with the testimony given by Marntin and Derrick. It shows, again, that the purpose of Chapman’s requests on April 2 was to obtain further explanation of how the surcharge was being calculated and to request that it be shown on his pay stub.
The majority concludes “that substantial evidence supports the Board’s finding that Chapman was reiterating the shared employee complaint” about the fuel surcharge expressed by the group at the January meeting. Supra at 340. But when the testimony is read in context, the Board did nothing more than improperly “prescribe what inferences from the evidence it [would] accept and reject” and the inferences it makes are not “reasonable inferences compelled by the evidence.” Sam’s Club, 173 F.3d at 239-40. The Board’s observation that Chapman complained “about the fuel surcharge” is not a fair reading of the evidence and does not support the conclusion that his actions on *346 April 2 were “a continuation of’ the drivers’ complaints. Supra at 340. In my view, the evidence compels the conclusion reached by the ALJ “that Chapman was raising a personal pay computation issue on April 2____” J.A. 236-37. By accepting the Board’s unreasonable reading of the testimony out of its context, the majority fails to “take into account” the parts of the record that “fairly detracts from the Board’s factfinding.” Sam’s Club, 173 F.3d at 239 (internal quotations omitted).
III.
“There can ... be no violation of § 8(a)(1) by the employer if there is no underlying § 7 conduct by the employee. Conduct must be both concerted and protected to fall within § 7.” Yesterday’s Children, Inc. v. NLRB., 115 F.3d 36, 44 (1st Cir.1997).
Employee activity protected under section 7 of the NLRA includes “the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.” 29 U.S.C. § 157 (2000). We recognize that this language is broadly-worded. However, it is not without limits. As we have noted, “[t]he purpose of the act was not to guarantee to employees the right to do as they please.” Joanna Cotton Mills Co. v. NLRB, 176 F.2d 749, 752 (4th Cir.1949)(internal citation omitted).
TNT Logistics of N Am., Inc. v. NLRB, 413 F.3d 402, 406-407 (4th Cir.2005).
The ALJ found that while there was evidence that the fuel surcharge “remained a subject of discussion among employees even at the time of Chapman’s discharge in April, ... Chapman was the only driver who still was voicing objections.” J.A. 242. As explained by the ALJ:
Chapman’s protest, of course, would still be protected even if he were the lone holdout trying to rally other employees to support this cause. Indeed, an individual employee’s complaints aimed at instigating group action is quintessential concerted activity.
However, the credible evidence does not establish that Chapman was trying to enlist the support of other employees or that, on April 2, 2007, he intended to speak for anyone but himself. On that date, Chapman sought, in effect, that [Piester] treat the reduction in pay as a deduction from pay and list it on the paycheck stub. The record does not establish that any other employees wanted, or had asked for, such a change. Therefore, I conclude that Chapman was acting by himself, and not continuing the employees’ January 13, 2007 concerted activity.
Credible evidence does not establish that, on April 2, 2007, [Piester] regarded Chapman as speaking or attempting to speak for anyone other than himself. Accordingly, it is difficult to find a nexus between Chapman’s discharge on that date and his protected activity several months earlier.
J.A. 242.
In reversing the ALJ’s decision, the Board concluded that “Chapman’s repetition of the complaint about the fuel surcharge change on April 2 was a continuation of earlier protected concerted activity.” J.A. 238. However, this faulty conclusion rests on the Board’s erroneous determination that Chapman’s request on April 2 “was made in the context of his underlying complaints about the fuel surcharge change.” J.A. 238. Although the Board’s decision is somewhat confusing on this point, it ap *347 pears to have relied on two items of evidence when it overruled the ALJ’s decision regarding “concerted activity”: (1) “that the employees continued to complain among themselves about the fuel surcharge change and that [Piester] knew of this continuing dissatisfaction,” J.A. 237, and (2) that “other employees also had requested that the fuel surcharge information be included on their worksheets.”[3] J.A. 238. The Board’s reliance on this evidence as a basis that Chapman acted with a “concerted voice” is unreasonable and is not supported by substantial evidence.
As the majority notes, we agreed in Krispy Kreme Doughnut Corp. v. NLRB, 635 F.2d 304 (4th Cir.1980), that concerted activity can occur even when it involves only a speaker and a listener. We also explained, however, that
[i]t will not satisfy this condition [ (concerted action) ] for Board action under Section 7 that an employee’s complaint may be directed at working conditions which affect all employees; “(i)t is ... necessary ... that the employee’s actions themselves at least contemplate such group activity [in order to support Board jurisdiction].” As was explained in Indiana Gear Works v. NLRB, 371 F.2d 273, 276 (7th Cir.1967), “in order to prove a concerted activity under Section 7 of the Act, it is necessary to demonstrate that the activity was for the purpose of inducing or preparing for group action to correct a grievance or a complaint.” Pelton Casteel, Inc. v. NLRB, 627 F.2d 23, 28 (7th Cir.1980). This construction of the statutory language determinative of when the action of a single employee will be deemed “concerted activity” within Section 7, is illustrated by Mushroom Transportation Company v. NLRB, 330 F.2d 683, 685 (3d Cir.1964):
It is not questioned that a conversation may constitute a concerted activity although it involves only a speaker and a listener, but to qualify as such, it must appear at the very least that it was engaged in with the object of initiating or inducing or preparing for group action or that it had some relation to group action in the interest of the employees.
635 F.2d at 307 (emphasis added).
We have also explained that
[d]etermining whether activity is protected or not depends on a proper identification of the activity’s purpose. “[I]t is not the motive of the participants that we are concerned with here but the purpose of the activity.” Id. at 753. To be protected “the purpose of the concerted activities must be the mutual aid or protection of the employees.” Id. By contrast, “personal missions are not the sort of concerted activity which the statute protects.” Media Gen. Operations, Inc. v. NLRB, 394 F.3d 207, 212 (4th Cir.2005).
TNT Logistics, 413 F.3d at 407 (emphasis added).
As the majority explains, it was Chapman who had “repeatedly complained ... about what he believed to be the substantial effect that the surcharge was having on his income.” Supra at 339 (emphasis added). It was Chapman who “had been engaging in an ongoing debate with the Company concerning exactly how much *348 was being taken from his paycheck.” Id, (emphasis added). It was Chapman who, according to the Board, “made an individualized request for a notation on his pay stub.” J.A. 238 (emphasis added). Consistent with these findings, Derrick’s testimony during cross-examination by the General Counsel ably illustrates the purpose of Chapman’s visit to the company office on April 2:
Counsel: He also wanted the surcharge to be shown on the pay stubs of all the employees, isn’t that correct?
Derrick: He never said anything about all the employees.
Counsel: Well, what did he say?
Derrick: He was complaining about hisself and his paycheck.
Counsel: Didn’t he say that the surcharge should be put on the pay stubs?
Derrick: He said that he would like it shown on his pay stub.
J.A. 190.
Other testimony shows that Chapman’s complaints diverged from those of the other drivers not long after the January meeting. Derrick testified on cross-examination that “[a] few” of the “other employees came in and complained about [the] surcharge ” but that those complaints “only lasted for a week or two” after the January meeting. J.A. 191, 193 (emphasis added). She also testified as follows:
Counsel: But everybody complained about — most of the employees, the drivers, did complain in some way about the surcharge.
Derrick: Once[,] until I explained it to them in a better manner.
Counsel: Didn’t they feel that they were losing money, the employees felt that they were losing money?
Derrick: At the beginning until it was explained to them correctly.
J.A. 191. Marntin likewise testified that “Chapman and Mr. Brian Smith and several other drivers” complained “[w]hen they [first] saw the deduction on their pay” in late January but that she had to explain the calculation of the surcharge to Chapman “a couple of times” because he didn’t seem to understand it.[4] J.A. 173-74. Neither Marntin, Derrick, nor Piester testified that any other driver complained about how the surcharge was calculated.
Despite Marntin and Derrick’s testimony, the Board found relevant the fact that “Piester, via [driver] McAlister, knew that the issue remained a concern to the employees.” J.A. 237. But, here again, “the issue” referenced by the Board was the drivers’ resentment “about the fuel surcharge,” not Chapman’s continued complaints about how it was being calculated vis-á-vis his paycheck. McAlister testified that the employees talked about “it” everyday — “it” being “the increase in the surcharge” or the “money being taken out of their pay.” J.A. 79-80. According to McAlister, he “told [Piester] it wasn’t right for him taking the fuel surcharge out of the drivers’ pay” and that it “wasn’t fair.” J.A. 83. But nothing in McAlister’s testimony indicated that anyone besides Chap *349 man had expressed confusion over calculation of the surcharge or wanted it shown on their pay stub.[5] As the Board acknowledges, the ALJ “found no evidence that other employees wanted or sought similar changes to their pay stubs.” J.A. 237.
The Board also relied on the fact that “other employees also had requested that the fuel surcharge information be included on their worksheets,” J.A. 238, to conclude that “[t]he mere fact that [the other drivers] had not additionally requested that the information be reflected on their pay stubs, does not exclude Chapman’s request from the scope of protected concerted activity.” Id. But the fact that the employees received the worksheets only bolsters the conclusion that Chapman’s “purpose” on April 2 did not involve group concerns. The worksheets allowed each employee, concurrent "with receipt of their paycheck, to see the fuel surcharge as it pertained to their individual loads hauled. Given that the drivers had the surcharge information on their worksheets and their complaints stopped once it had been explained to them by Derrick, there was simply no evidence in the record that, despite their ongoing private grumblings “about the fuel surcharge,” any driver other than Chapman was unsatisfied with, or did not understand, how the surcharge was being calculated.[6]
Not only is the purpose of Chapman’s discussion with Marntin, Derrick and Piester on April 2 clear, the only evidence that Chapman intended to act on behalf of the group on April 2 came from his wholly discredited testimony that he told a another driver he had been fired “because I was talking about our money.” J.A. 100. That driver expressly disputed Chapman’s claim, as the ALJ noted:
Chapman’s interest in the outcome of this proceeding — he stood to regain his job with backpay — may have affected his recollection. For example, Chapman described a conversation he had with another driver on April 2, 2007, just after [Piester] discharged him. Chapman testified that he told this driver that Piester fired him “because I was talking about our money.” However, according to the other driver ... Chapman said he had been fired because “he got loud in the office.”
J.A. 241. There is also no evidence in the record that any of the other drivers encouraged, endorsed or even knew about Chapman’s effort on April 2 to have the fuel surcharge shown on his pay stub.
A fair reading of the testimony as a whole shows that the drivers’ continued complaints “about the fuel surcharge” is simply not the same “activity” in which Chapman was engaged on the date of his *350 discharge. The record clearly establishes that Chapman’s purpose on April 2 was to try, again, to understand for himself how the surcharge was being calculated and to have it placed on his pay stub. By accepting the Board’s view that Chapman’s actions on April 2 constituted “concerted protected activity,” the majority effectively accepts as sufficient evidence, contrary to Krispy Kreme, the fact that Chapman’s “individualized request for a notation on his pay stub” might “affect all employees.” 635 F.2d at 307. It reaches this conclusion despite no evidence that his efforts were “for the purpose of ... mutual aid or protection,” 29 U.S.C.A. § 157 (West 1998), or “for the purpose of inducing or preparing for group action to correct a grievance or a complaint.” Krispy Kreme, 635 F.2d at 307 (internal quotations omitted). For these reasons I find the Board’s determination that Chapman was engaged in concerted action to be wholly unreasonable and I would, accordingly, reverse the Board’s determination that the company violated § 8(a)(1) on April 2, 2007, either by threatening to discharge Chapman or by actually discharging him.[7]

. There is no question that, as Piester concedes and the ALJ and the Board found, the employees were engaged in protected, concerted activity when they voiced their group complaints about imposition of the fuel surcharge during the January 13, 2007 meeting.

. The circumstances surrounding the April 2 meeting also emphasize the individual nature of Chapman’s actions. His truck had a flat tire and he was instructed to pull around and have it fixed. While it was being repaired, he took the opportunity to go to the company's office and speak with Marntin and Derrick. The fact that Chapman came to the office to speak with the administrative personnel indicates that he did not intend to plea for rescission of the surcharge, because Piester was the only one with authority to change that policy. *345 Chapman’s impromptu meeting with Piester only occurred because Derrick was unable to resolve his pay stub issue.

. Each driver receives a worksheet with his paycheck showing information about each load he picked up, including "where [he] picked it up from and delivered to and how many times.” J.A. 158. It also shows "the rate, ... the fuel surcharge, and the dollar amount that the truck makes. Then depending on what the truck makes, what percentage [the driver] makes.” Id.

. Derrick agreed that Chapman and Smith "were the most vocal complainers about this surcharge” but because Smith quit the week after the surcharge was instituted, Chapman was the only driver continuing to express concerns. J.A. 191. Smith did not complain to Derrick or Marntin until after he quit. Smith said he quit "because of the fuel surcharge” and, indeed, nothing in his testimony indicates he complained to anyone at the Company about calculation of the surcharge. J.A. 62-63.

. In light of my view of the record in this case, the majority's citation to Dayton Typographic, 778 F.2d 1188 (6th Cir.1985), is unpersuasive. In that case the only complaint from the employees was having to work on Saturdays without pay. Here, as discussed, the evidence shows that Chapman's complaints leading to his discharge were categorically different. Even more pertinent to the finding of concerted action in Dayton Typographic was the fact that the company put forth no evidence showing the employees did not continue to be "interested in the Saturday work issue.” Id. at 1192. In the case at bar, the evidence demonstrates that while the drivers continued to complain about the surcharge, none other than Chapman had continued to seek explanations of how it was calculated or asked that it be put on their pay stub.

. In fact, the most reasonable inference is that the other drivers would not want surcharge information on their pay stubs because, as Derrick explained, there would be adverse tax and payroll implications to the drivers for doing so. Doing so would not be "in the interest of the employees.” Mushroom Trans. Co., 330 F.2d at 685.

. Given my conclusion based on the record that Chapman’s complaints in April were not a continuation of the group complaints at the January meeting, I disagree with the majority’s characterization of Manimark Corp. v. NLRB, 7 F.3d 547 (6th Cir.1993). See supra at 340 (distinguishing Manimark because “while the complaint at issue in Manimark was one shared by other employees, there was 'nothing to indicate that [the employees] had decided to act upon those’ complaints.”). Here, not only is there no evidence showing the employees shared Chapman’s complaints expressed on April 2, there is no evidence that Chapman "was acting in anyone’s interest but his own on [April 2].” Manimark, 7 F.3d at 551.